UNITED STATES of America, Appellee,

v.

Harry BERNSTEIN et al., Appellants.

Nos. 941, 942, 943 and 945, Dockets 74–2328, 74–2329, 74–2462, 74–2463 and 74–2464.

United States Court of Appeals, Second Circuit.

Argued June 9, 1975.

Decided March 4, 1976.

Frank G. Raichle, Buffalo, N. Y. (Raichle, Banning, Weiss & Halpern, R. William Stephens, Buffalo, N. Y., of counsel), for appellants Bernstein and Eastern Service Corp.

Henry J. Boitel, New York City, for appellant Behar.

John A. Kiser, New York City, for appellant Cardone.

Ronald E. DePetris, Asst. U. S. Atty., Brooklyn, N. Y. (David G. Trager, U. S. Atty., E. D. N. Y., Paul B. Bergman, Asst. U. S. Atty., Brooklyn, N. Y., of counsel; Gale A. Drexler, on the brief), for appellee.

Before FEINBERG, OAKES and VAN GRAAFEILAND, Circuit Judges.

OAKES, Circuit Judge:

This appeal is from convictions for "white collar" crimes in connection with the obtaining of Federal Housing Administration (FHA) guarantees on mortgage loans. For proof of the crimes involved, such a multiplicity of small transactions was necessary to be shown that the trial in the United States District Court for the Eastern Dis-

trict of New York, Anthony J. Travia, *Judge*,[*] took over eight months with a resultant 25,000-page transcript. The three types of offenses of which appellants were found guilty include conspiracy, 18 U.S.C. § 371, substantive bribery offenses, 18 U.S.C. § 201 and 18 U.S.C. § 2, and substantive false statement offenses in applications for mortgage insurance in violation of 18 U.S.C. § 1010 and 18 U.S.C. § 2. All appellants were convicted of conspiracy, all appellants except Melvin Cardona of bribery, and all appellants except Rose Bernstein of false statements.[1] The appellants have launched a multiple attack on the convictions, their claims ranging, *inter alia,* from disqualification of the trial court and prosecutorial mismanagement to erroneous admission of evidence, insufficiency of evidence and erroneous instructions to the jury. While we find some of their arguments troublesome, we find none of them meritorious, and affirm the convictions.

[*] Now retired.

1. The conspiracy count in the redacted indictment was Count 1; the false statement counts submitted to the jury on which there were findings of guilty were 2, 4, 5, 7, 9, 10, 12, 14, 16–18, 20, 21, 23, 25, 26, 27 and 31; the bribery counts on which there were findings of guilty were 35–39, 41, 42, 44, 46, 48, 50, 51, 53, 55, 57, 59, 63 and 65. Eastern Service Corp. (ESC) was acquitted on bribery Counts 29, 33 and 61, Harry Bernstein was likewise, Rose Bernstein was acquitted on bribery Counts 29, 33 and 62, and Florence Behar was acquitted on Count 33. False statement Counts 2 and 20 were dismissed as to Harry and Rose Bernstein and Counts 25 and 50 as to Rose Bernstein.

The jury disagreed with respect to the defendants Dun & Bradstreet, Inc. (conspiracy and ten false statement counts), Arthur Prescott (conspiracy and ten false statement counts) and Herbert Cronin (conspiracy and 11 overvaluation counts). One false statement count had been dismissed on consent against the defendants Dun & Bradstreet, Inc., and Prescott at the end of the Government's case. The jury acquitted the defendant Joseph Jankowitz (conspiracy and two bribery counts). The jury was discharged by the court on July 5, 1974. Thereafter, by order dated November 25, 1974, the court granted motions by the defendants Dun & Bradstreet, Inc., and Prescott for a judgment of acquittal on the conspiracy and ten false statement counts as to which there was a hung jury.

I. *Statement of Facts.* The FHA is a division of the Department of Housing and Urban Development (HUD). FHA has a loan guarantee program well known to the public whereby it grants mortgage insurance to a lender-mortgagee who is thereby insured against loss if the mortgagor is unable to pay off the loan. The mortgage insurance in the instances here involved was obtained in a two-step procedure. The first step was for the mortgagee to apply to the FHA for an appraisal of the property; this was made on a "Form 2800." The second was the mortgagee's application for approval of the mortgagor's credit; this was made on a "Form 2900" and includes certain necessary information and exhibits including a credit report, verification of employment form, and the like. If an appraisal of the property is up to sufficient value, the FHA will issue a conditional commitment which it then makes firm if the mortgagor's credit is satisfactory and approved.

On October 4, 1974, appellant Harry Bernstein was sentenced to a term of imprisonment of five years on the conspiracy count, five years on each of the 16 bribery counts, and two years on the false statement count, the terms to run concurrently. He was also fined $10,000 on the conspiracy count, $10,000 on each of 16 bribery counts, and $5,000 on one false statement count, all fines to run consecutively (making a total fine of $175,000). Appellant Rose Bernstein was sentenced to a term of imprisonment of four years on each count to run concurrently, and a fine of $10,000 on the conspiracy count and $10,000 on each of four bribery counts to run consecutively (making a total fine of $50,000). Appellant ESC was fined $10,000 on the conspiracy count, $5,000 on each of the 18 false statement counts, and $20,000 on each of the 18 bribery counts, all fines to run consecutively (making a total fine of $460,000). Appellant Behar was sentenced to a term of imprisonment of two years on each count to run concurrently and a fine of $1,000 on each of three bribery and 18 false statement counts to run consecutively (making a total fine of $21,000). Appellant Cardona was sentenced to a term of imprisonment of two years on each count to run concurrently and a fine of $1,000 on each of 17 false statement counts to run consecutively (making a total fine of $17,000). Execution of sentence was stayed, and the appellants have been free on bail pending this appeal.

Eastern Service Corporation (ESC) was a lending institution wholly owned by appellant Harry Bernstein. It would initially loan money to home buyers and subsequently sell the mortgage loans to permanent lenders, such as savings banks, pension funds, and the Federal National Mortgage Association, while being retained, however, to perform the administrative tasks involved in servicing the mortgage.

ESC made its profit from two major sources—the origination and sale of loans and the servicing of loans. On loan closings there was an origination or processing fee of one "point," i. e., one per cent of the mortgage amount. In addition the corporation would charge a certain number of "points" to the real estate broker or speculator who sold the home and, after the loan closed, the mortgage would be sold by ESC to a permanent lender at a discount of a certain number of points. Thus the profit for ESC was the difference between the points charged to the broker or speculator and the points at which the loan was discounted, plus the processing fee and any servicing fee, less expenses.

The Government's case, boiled down to the bare essentials, was that the Bernsteins procured on behalf of ESC favorable FHA appraisals by virtue of bribes to FHA staff appraisers working out of the Hempstead, New York, regional office. ESC also obtained approvals of individual mortgagors' credit by virtue of a number of false credit statements submitted and certified or processed by Florence Behar, who was an assistant vice president of ESC in charge of the processing section. A number of these were solicited by Melvin Cardona, one of approximately 12 to 14 mortgage solicitors employed by ESC, who also obtained false financial reports on the mortgagors' behalf.

Government proof on the bribery counts went to the very heart of the FHA office involved, located, as it happened, in the same building with ESC. One FHA staff appraiser receiving the bribes was Edward Goodwin, who performed and reviewed appraisals in Brooklyn; he was assigned appraisal applications from time to time by coconspirator Rose Cohen and his appraisals were reviewed by defendant Joseph Jankowitz, a senior FHA staff appraiser. Defendant Herbert Cronin, the chief underwriter of the FHA office, was responsible for overseeing all appraisals, and had the "chief underwriter's prerogative" (CUP) by which an FHA appraisal might be increased in his discretion up to a maximum of $500 on a particular property.

One of two principal real estate speculators active in Brooklyn and involved in the case was Jet Warehouse, Inc. (Jet), another wholly owned corporation of Harry Bernstein. Jet held second mortgages on a number of properties which were later refinanced by way of FHA-insured mortgages. Jet also loaned money to various real estate speculators to purchase properties, on which applications would be submitted to the FHA. The other such speculator was Ortrud Kapraki, who, along with Goodwin, was a chief Government witness and who in 1968–70 had approximately 200 closings at ESC, amounting to about five per cent of ESC's business in FHA-insured mortgages.

ESC was an FHA "approved mortgage lender" and as such, lending on an interim basis, it was able to make considerable profits with very little risk and with a limited use of capital. In the nature of economic life, once FHA mortgage insurance has been procured only low down payments are required, a permanent lender is readily available to purchase the mortgage from the interim lender, and if the mortgage goes into foreclosure the interim lender knows that the FHA will pay virtually full value on the outstanding loan so that there is no great risk of foreclosure. The risk is, in fact, for all practical purposes after assorted points are charged, close to zero. The Government proof adduced was also to the effect that at least as to the second phase of the mortgage insurance process— the mortgagor's credit—the FHA is dependent upon the approved mortgagee, and we may say upon the latter's integrity. This is so because only the mortgagee personally interviews the mortgagor and it is the mortgagee which has the obligation to

obtain verification of employment and income and to obtain other credit information regarding a mortgagor's employment and income.

It was after the inner city riots in 1966 and FHA intervention to improve the inner cities that ESC and Jet really went into what was a new market. Government proof adduced was to the effect that after an initial approach by Harry and Rose Bernstein to Edward Goodwin, the latter, with the approval of Chief Underwriter Cronin but contrary to FHA policy, went to the Bernstein office, supposedly to pick up some keys to properties. In reality he was there approached with an arrangement whereby he would obtain $50 per property on any Bernstein "2800" form applications for appraisal. When Cronin asked Goodwin how he made out on the business of the "keys," Goodwin replied that there was no problem. After that meeting in March, 1967, Goodwin was "on the take" and he and Bernstein arranged a plan whereby in order to tell which houses were Jet's, Bernstein would identify them as "ORE," meaning "our real estate," not what the parties were to mine out of the federal government. According to Goodwin's testimony, Rose Bernstein encouraged him to accept the $200 proffered by Harry Bernstein for the first four top dollar appraisals. This was only the beginning, and Government proof was that bribes were proffered by the Bernsteins and taken by Goodwin on many occasions.

Providing an initial high appraisal was only part of the bribed services rendered, however, because in several cases when ESC submitted a request for a reevaluation Cronin would return the files to Goodwin, ask him to take another look at the value, saying in words to the effect of "Is that all it's worth? Take another look." Goodwin would take it to his desk, increase the value, and return the file to Cronin's office. Cronin would then exercise his prerogative, the CUP, and increase the value an additional $500 more. For four years, and through

hundreds of these appraisals, ESC and the Bernsteins would obtain high initial appraisal, frequent upward reevaluation, and then the almost omnipresent CUP. On each of the bribery counts on which the various appellants other than Cardona were convicted, the Government proof established this with some clarity.[2] Evidence indicated that Jet held second mortgages on nine and owned three of the properties involved in the bribery counts.

Bribery also occurred in reference to applications for appraisals on a number of the so-called Kapraki properties. In the summer of 1968 the other real estate speculator, Kapraki, began to submit an increased number of applications for appraisals to ESC, and appellant Behar told her that she should have the right appraiser and introduced her to the Bernsteins. Behar told her that it was important to pay the appraisers at the going rate of $50 per property and advised the Bernsteins that since Kapraki was a volume dealer she should have staff men, i. e., fulltime FHA appraisers like Goodwin, to handle her properties. Both Harry Bernstein and Rose Bernstein informed Kapraki that she would have to take care of the appraisers. Thereafter Kapraki would tell Behar when she wanted the "right appraiser," and Behar either alone or with Kapraki would speak to the Bernsteins. The Bernsteins would arrange to have either Jankowitz or Goodwin do the appraising, and either Rose Bernstein or Behar would notify Kapraki that Jankowitz or Goodwin would be appraising her properties on certain dates. Pursuant to their suggestions, Kapraki would meet the appraiser each time and pay him $100 per property. As for the method by which the "right" appraisers were assigned, there was ample evidence to show that ESC appraisal applications were delivered to Herbert Cronin, who would give them to Goodwin or to Rose Cohen, with a direction to assign them to Goodwin or Jankowitz. There was evidence, indeed, that for at least two years Rose Cohen, who testified for the Govern-

---

2. The properties referred to in the substantive counts may not have been the only properties

as to which Goodwin received payments from ESC and Harry Bernstein. *See* note 3 *infra.*

ment, was receiving bribes from Rose Bernstein to assign cases to particular appraisers, especially Goodwin and Jankowitz. On four of the bribery counts on which the appellants were convicted there was proof linking Rose Bernstein and Behar to Goodwin appraisals for Kapraki that were "right" and on three of those there was proof indicating Harry Bernstein's involvement with Kapraki's requests for the "right" appraiser.

The false statement counts on which ESC, Behar, Cardona and Harry Bernstein were convicted all concern false representations of employment or self-employment in ESC applications for approval of mortgage credit, supported either by an accountant's false financial statements verifying self-employment or by false verifications of employers. Government evidence established that Kapraki originally had been solicited on behalf of ESC by way of appellant Cardona, the commissioned mortgage salesman for ESC, who explained the basic FHA application procedures to her. It was in March, 1968, after a number of Kapraki's purchasers had been turned down by the FHA, that Cardona and Behar offered to assist her. Kapraki indeed offered to pay Behar $50 to $75 per case—an internal bribe—to get FHA approvals. Kapraki, with Cardona's assistance, thus commenced to create false appearances of sufficient income on FHA mortgage credit applications. After Cardona suggested various means of obtaining false verifications of nonexistent part-time jobs for Kapraki's applicants, Kapraki herself began to obtain these until she heard in September-October of 1968 that she was getting a "reputation" around town for such a service. Cardona then told Kapraki that they could utilize an accountant in the Bronx, Walter Blow, who would make false financial statements as to self-employment for the use of the applicants. The availability of Blow, in effect, had been announced by Cardona's sales manager at a sales meeting at ESC at which Harry Bernstein was present. In March, 1969, when Blow's statements came to be questioned, Cardona recruited another accountant, later a Government witness, to

perform Blow's service. Cardona also advised Kapraki regarding assorted other techniques to insure FHA approval, such as submitting false affidavits to substantiate exaggerated down payments, forging lawyer's signatures for false escrow letters, and minimizing the number of dependents, or altering the age of the mortgagor in the application forms. Kapraki gave Cardona $95 for each set of the accountant's false financial statements and $145 for such a set plus false income tax returns, paying him usually in cash but sometimes by check, with Cardona pocketing some of the money for himself.

Appellant Behar, who took, as we said, a special interest in Kapraki's applications, no doubt because of their volume and profitability to ESC, assigned an experienced processor, one Pat Buckley, whom Kapraki agreed to pay at the rate of $50 per case, to handle them. For Behar's own aid in expediting applications, Kapraki paid $50 or $75 per property to begin with, then up to $200 per property, and finally $250 by June, 1969. Usually Kapraki left the money in cash in an envelope in Behar's desk drawer, but in a number of instances by way of checks payable to Cash, or to Kapraki with her endorsement. These checks, with Behar's endorsements, were introduced in evidence. Behar's assistance in expediting applications went beyond a passive acceptance of their content. Behar told Kapraki to have her mortgagors sign the applications in advance in blank and, knowing that they were certifying to the truth and completeness of information which was only later typed in by Kapraki, Behar as the chief supervising processing officer of ESC would nevertheless sign the mortgagee's certification to the FHA verifying the truth of the information in the applications. Cardona and Behar also gave Kapraki blank verification of employment forms, in violation of FHA requirements. When Behar called Kapraki to tell her that Dun & Bradstreet, ESC's credit report service, was inquiring why so many of Kapraki's mortgage applicants worked at the "Bocar" service station, Behar asked, "They all work there, don't

they?" But she never sent an employee of ESC out to check with this supposed employer. Cardona simply told Kapraki not to use the same place all the time.

One of the ESC people, Frank Fey, a vice president who pleaded guilty and testified for the Government, was inquisitive as to Kapraki's many delinquencies and the coincidence of her use of the same accountant, Blow, to verify so many self-employments. In late 1968, Fey told Behar, "Florence, let's stop the bullshit, you know as well as I that these deals are phonies." Behar continued to sign the mortgagee's certificates and, despite intermittent questions, even by the FHA, concerning potentially implausible information in the Kapraki applications, Behar never checked the validity of the representations beyond Kapraki's word.

Fey mentioned his concerns about fraud being involved in Kapraki's transactions to his bosses, Harry and Rose Bernstein. Despite his urging them to stop processing Kapraki's applications both of them took the position that it was better to do the business and let the FHA decide, especially in view of the number of points ESC was charging Kapraki. The Government proof was in effect that at least by the spring of 1969 Harry and Rose Bernstein were content to have ESC process applications which their supervisor, Behar, their salesman, Cardona, and their vice president, Fey, knew were phony.

II. *Pretrial Motion to Disqualify.* Appellants timely moved with supporting affi-

davits to disqualify Judge Travia because he had accepted guilty pleas under other indictments and made certain comments in respect to other defendants, some of whom were named as codefendants and coconspirators of ESC, Harry Bernstein and Rose Bernstein.[3] They contend that under 28 U.S.C. § 144,[4] they presented a "sufficient affidavit" of Judge Travia's "personal bias or prejudice," so as to have required his recusal. *See Berger v. United States,* 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481 (1921). The question is whether the supporting affidavit is legally sufficient, *i. e.,* alleges facts which support the charge of bias and prejudice and whether such bias and prejudice stem from an extrajudicial source. *Wolfson v. Palmieri,* 396 F.2d 121, 124 (2d Cir. 1968); *Rosen v. Sugarman,* 357 F.2d 794, 797–98 (2d Cir. 1966).

The remarks of the judge which allegedly reveal prejudice were made in the course of Rule 11 questioning of codefendants Goodwin, Kapraki, Cohen and Fey at the time of taking their pleas and in the course of sentencing, *see* note 3 *supra.* The questioning related to the nature of the conspiracy and the role of various conspirators, including the Bernsteins and ESC. The judge in those remarks characterized the conspiracy as "this terrible scheme" and "a great big scheme," and stated, "I am sure this conspiracy has cost society millions of dollars by way of payment of taxes and otherwise, and the people who get involved in these houses were dealt with very sharp-

---

**3.** The instant indictment was one of 13 returned by a grand jury against ESC and the Bernsteins, containing a total of about 800 counts and naming 50 defendants. These and several other FHA-related indictments from the same grand jury were assigned to Judge Travia. Eleven defendants involved in these prosecutions pleaded guilty prior to March 22, 1973; eight of these were codefendants and coconspirators of ESC and the Bernsteins, and six were sentenced. It was on that date that appellants ESC, Behar and the Bernsteins filed the affidavit supporting the motion for recusal, citing excerpts from the sentencing proceedings and from the guilty plea inquiries pursuant to Fed.R.Crim. P. 11.

**4.** 28 U.S.C. § 144 provides:

Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

ly. You cannot close your eyes to these things." [5]

Each of the comments made by the judge was in the course of a judicial proceeding in the context of discussions with the defendants before him. None of them appears to have arisen from an extrajudicial source or "resulted in the formulation of an opinion on the merits not based upon what the judge has learned by his participation in the proceedings . . . ." *United States v. Sclafani,* 487 F.2d 245, 255 (2d Cir.) (reference at sentencing of codefendant to remaining defendants as "people who have poisoned your existence and placed you on the road of delinquency," *id.* at 252), *cert. denied,* 414 U.S. 1023, 94 S.Ct. 445, 38 L.Ed.2d 313 (1973). *See United States v. Grinnell Corp.,* 384 U.S. 563, 583, 86 S.Ct. 1698, 1710, 16 L.Ed.2d 778, 793 (1966). The rule of law, without belaboring the point, is that what a judge learns in his judicial capacity—whether by way of guilty pleas of codefendants or alleged coconspirators, or by way of pretrial proceedings, or both—is a proper basis for judicial observations, and the use of such information is not the kind of matter that results in disqualification. Rules against "bias" and "partiality"

can never mean to require the total absence of preconception, predispositions and other mental habits, as Judge Frank said so much more felicitously in *In re Linahan, Inc.,* 138 F.2d 650, 651–52 (2d Cir. 1943). Of course such judicially acquired information or those natural preconceptions may lead a judge to feel a bias or prejudice that requires him to disqualify himself—this was still, or at least until December 5, 1974, when new 28 U.S.C. § 455 when enacted, however, a matter for the individual judge subjectively to determine. Judge Travia made no such determination here; a petition to this court for a writ of mandamus on this issue was indeed denied. The point is of no avail.[6]

■ III. *Sufficiency of the False Statement Counts.* Harry Bernstein, ESC, Behar and Cardona contend that the false statement counts under 18 U.S.C. § 1010 [7] under which they were convicted failed sufficiently to charge a crime. More specifically, appellants argue that these counts fail to specify or identify the specific statements alleged to be false and fail to allege the essential element of knowledge that the statements were false.

---

5. Appellants take particular umbrage at Judge Travia's reference to the "whole scheme" costing the Government "upwards of two or three hundred million dollars, and who's paying for that?", and answering his own question, "Joe Blow, the guy on the street is paying for the high living of many." They now claim that the amount of money referred to was taken from an extrajudicial source, a press report, and that there was no evidence that the Bernsteins engaged in "high living." The affidavit, however, was by no means so specific; it merely alleged that the judge had formed an opinion derived from "some speculation or information outside the record." *Hodgson v. Liquor Salesmen's Union Local No. 2 of State of N.Y.,* 444 F.2d 1344, 1348–49 (2d Cir. 1971). None of the statements relate to guilt or innocence of these appellants and were simply responses to the explanations or pleas for clemency of those pleading guilty or being sentenced. Moreover, the press reports referred to on appeal were part of the papers attached to motions for dismissal of the indictments on the ground of prejudicial pretrial publicity.

6. Neither the judge's conduct of the trial, *see* Part VIII *infra,* nor anything we said in *Winters*

*v. Travia,* 495 F.2d 839 (2d Cir. 1974), is to the contrary.

7. 18 U.S.C. § 1010 provides:

Whoever, for the purpose of obtaining any loan or advance of credit from any person, partnership, association, or corporation with the intent that such loan or advance of credit shall be offered to or accepted by the Department of Housing and Urban Development for insurance or for the purpose of obtaining any extension or renewal of any loan, advance of credit, or mortgage insured by such Department, or the acceptance, release, or substitution of any security on such a loan, advance of credit, or for the purpose of influencing in any way the action of such Department, makes, passes, utters, or publishes any statement, knowing the same to be false, or alters, forges, or counterfeits any instrument, paper, or document, or utters, publishes, or passes as true any instrument, paper, or document, knowing it to have been altered, forged, or counterfeited, or willfully over-values any security, asset, or income, shall be fined not more than $5,000 or imprisoned not more than two years, or both.

For all practical purposes we can treat the assorted counts as identical since their form is the same and they differ only as to the date, the particular defendants named and the property address to which the application relates. Taking Count 25 as an example (because it is the only count in which four of these appellants were charged and convicted), we set it out in the margin.[8] We note that Count 25 identifies the particular false document involved, that is, an application for mortgage insurance with respect to a particular property. It may also be noted that the Government provided a bill of particulars which specifically identified the statements in the documents which the Government would seek to prove false at trial. A copy of the "Form 2900" for each false statement count was submitted to the jury with the statements alleged to be false circled in red by the court.

We do not find any violation of either the Fifth or Sixth Amendment to the United States Constitution or of Fed.R.Crim. P. 7(c)(1). We have "consistently sustained indictments which tracked the language of the statute and, in addition, do little more than state time and place in approximate terms." *United States v. Salazar*, 485 F.2d 1272, 1277 (2d Cir. 1973), *cert. denied*, 415 U.S. 985, 94 S.Ct. 1579, 39 L.Ed.2d 882 (1974); *United States v. Trotta*, 525 F.2d 1096 (2d Cir. 1975), slip op. 473, 477; *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50, 44 U.S.L.W. 3201 (1975). The indictments here in issue do just that.

▇▇▇ The counts are particular in that they specify the property involved which serves to fix and identify the particular false document. It is the submission of the false document which constitutes the separate crime. *Tripp v. United States*, 381 F.2d 320, 321 (9th Cir. 1967); *Bins v. United States*, 331 F.2d 390, 393 (5th Cir.), *cert. denied*, 379 U.S. 880, 85 S.Ct. 149, 13 L.Ed.2d 87 (1964). *See Cohen v. United States*, 178 F.2d 588, 591 (6th Cir. 1949), *cert. denied*, 339 U.S. 920, 70 S.Ct. 623, 94 L.Ed. 1344 (1950). While some identification is required, *United States v. Borland*, 309 F.Supp. 280, 287–89 (D.Del.1970); *United States v. Devine's Milk Laboratories, Inc.*, 179 F.Supp. 799 (D.Mass.1960), it is not necessary that the indictment itself go into evidentiary matters. The offense was fully and clearly charged, since the indictment specified the time and place of the transaction and the submission of a particular false application in respect to a particular piece of property. *United States v. Alo*, 439 F.2d 751, 756 (2d Cir.) (indictment for obstructing justice by giving "false and evasive answers" before SEC sufficient although not specifying the false and evasive answers), *cert. denied*, 404 U.S. 850, 92 S.Ct. 86, 30 L.Ed.2d 89 (1971). *See also United States v. Weiss*, 491 F.2d 460, 466 (2d Cir.), *cert. denied*, 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (1974) (indictment for obstruction of justice by failing to produce documents before grand jury sufficient though it fails to specify in what way conduct was done corruptly).

It is, of course, for just this reason that bills of particulars to be furnished pursuant to Fed.R.Crim.P. 7(f) may be sought, *United States v. Debrow*, 346 U.S. 374, 376–78, 74 S.Ct. 113, 114–16, 98 L.Ed. 92, 96–97 (1953), and must be provided to make certain that there is adequate notice under the Sixth Amendment. *See United States v. Alo, supra*, 439 F.2d at 756 n.13. The indictment as amplified by the bill of particu-

---

8. Count 25 of the redacted indictment (originally Count 20 of the superseding indictment here, 72 Cr. 587) charged as follows:

On or about the 3rd day of April, 1969, within the Eastern District of New York, the defendants Rose Bernstein, also known as Rose Shorenstein, Harry Bernstein, Florence Behar, Ortrud Kapraki, Melvin Cardona and Eastern Service Corporation, for the purpose of influencing the Federal Housing Adminis-

tration of the Department of Housing and Urban Development to insure a loan and advance of credit by the defendant Eastern Service Corporation, did knowingly make, pass, utter and publish false statements in an application for mortgage insurance on property located at 416 52nd Street, Brooklyn, New York. (Title 18, United States Code, § 1010 and § 2).

lars made clear to the appellants what was the nature and cause of the Government's case and gave them ample opportunity to prepare their defense. *See United States v. Sperling,* 506 F.2d 1323, 1344–45 (2d Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975).

 Appellants also argue, however, that failure to specify the particular false statements in each of the separate counts allows no way of determining whether each false statement for which they were prosecuted was indeed the false statement that was considered by the grand jury. They rely on *Russell v. United States,* 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962), and *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), neither of which, however, would required the indictments here to be held defective for failing to specify each false statement. *Stirone* held improper the admission of evidence of an activity geographically different from that specifically charged in the indictment, but no such departure in proof from the specific allegations of the appellants' acts occurred here. *Russell* required that where the specific subject matter of a question refused answer by a defendant was central to every prosecution under 2 U.S.C. § 192, because it constituted "the very core of criminality" to be proved, the indictment must specify the particular subject matter involved. Under 18 U.S.C. § 1010, however, the critical element of the offense is the mental state of *knowingly* making false statements. Since the "core of criminality" is not the substance of the false statements but rather that knowing falsehoods were submitted to the FHA, appellants have not been subjected to second guessing by the

prosecutor or the trial jury on the particular and essential subject matter of this offense, that is, the existence of falsehoods in specific documents for specific properties.[9]

IV. *Disqualification of Appellant Behar's Counsel.* Appellant Behar argues that she was unconstitutionally denied representation by counsel of her choice when the court found that an actual conflict of interest existed and refused to accept a waiver of any potential conflict of interest, ordering appellant's attorney to terminate his representation of her. It was the Bernsteins' attorney, Abraham Brodsky, who told Behar that he would get a lawyer for her, and indeed he did refer her to Henry Boitel, Esq. With her knowledge and consent Mr. Boitel's fee was being paid by the Bernsteins and ESC. Since Behar was a co-defendant, however, there was every possibility of a conflict of interest. A hearing was held, Mr. Boitel withdrew, appellant waived any conflict of interest, and the court found that the waiver was not knowing and intelligent. The court then asked appellant Behar to retain new counsel, and if she was unable to do so to return and the court would appoint counsel for her. When she reappeared and said she could not afford to retain counsel herself, the court assigned Richard Rosenkrantz, Esq., as her attorney. Mr. Boitel has, it may be stated, ably represented her on appeal.

 We have repeatedly held, as have other courts, that representation free from conflicting interests is an essential part of the Sixth Amendment right to the effective assistance of counsel. *See Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942); *United States v. DeBerry,* 487

---

**9.** As we said in *United States v. Fortunato,* 402 F.2d 79, 82 (2d Cir. 1968), *cert. denied,* 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969), "the omission of the means by which the offense was committed does not render the indictment insufficient." *Cf. Rosen v. United States,* 161 U.S. 29, 34, 16 S.Ct. 434, 40 L.Ed. 606 (1896) (defendant not entitled to know particular parts of document which grand jury had found to be obscene); *United States v. Ciramy,* 510 F.2d 69, 73 (2d Cir. 1975) (manner of attempted evasion of income taxes not essential to indictment). Moreover, as we have said, the court's

charge on the question of false statements was perfectly proper because the jury was instructed to limit itself to determining whether there were false statements in any particular application concerning employment and income therefrom and the mortgagee's certificate; for the jury's consumption in the jury room the court circled in red the particular statements which were alleged to be false. As appellant Behar explicitly concedes in her brief, "there was never any issue as to the fact that the statements were false . . . ." The only real issue was as to knowledge.

F.2d 448, 452 (2d Cir. 1973); *United States ex rel. Hart v. Davenport,* 478 F.2d 203, 209–10 (3d Cir. 1973); *United States v. Foster,* 469 F.2d 1, 4–5 (1st Cir. 1972); *Lollar v. United States,* 126 U.S.App.D.C. 200, 376 F.2d 243 (D.C.Cir. 1967). Choice of counsel should not be unnecessarily obstructed by the court, *United States v. Sheiner,* 410 F.2d 337, 342 (2d Cir.), *cert. denied,* 396 U.S. 825, 90 S.Ct. 68, 24 L.Ed.2d 76 (1969), but where there is a serious possibility that a definite conflict of interest will arise, the necessities of sound judicial administration require the court to take command of the situation. *United States v. Dardi,* 330 F.2d 316, 335 (2d Cir.), *cert. denied,* 379 U.S. 845, 85 S.Ct. 50, 13 L.Ed.2d 50 (1964). The standards of the American Bar Association have become increasingly strict on this subject. *See* ABA Standards Relating to the Prosecution Function and the Defense Function § 3.5, at 211, 213 (Approved Draft 1971). *See also* P. Wilson, Pattern Rules of Court and Code Provisions 38–39 (prepared for the Committee on Implementation of Standards for the Administration of Criminal Justice of the Section of Criminal Justice of the ABA, 1975).

 Plainly here there was a probability of conflicting and inconsistent defenses based upon corporate and individual liability, since as an employee of ESC Behar could well take the stand and present a defense that her employers were the guilty ones because she was only obeying the orders of her superiors and following standard office procedure. On their part, they could assert the defense that Behar had acted ultra vires and on her own. Indeed, these were the ultimate defenses advanced by each. Since the codefendants were un-

derwriting Behar's defense, this readily apparent conflict could be seen by the court to indicate a significant probability of prejudice. The freedom of the attorney, whether in cross-examination or assertion of the defense of lack of authority, could have been inhibited and a full and uncompromised defense of his clients' interests have been seriously impaired. While neither Judge Travia nor this court in any manner questioned the integrity of Mr. Boitel or his assurance that he would give Behar full and proper representation regardless of who was paying him, the court had a special duty to make certain that any waiver was knowingly and intelligently made.[10] *See United States v. DeBerry, supra,* 487 F.2d at 452–54. *But cf. United States v. Wisniewski,* 478 F.2d 274, 285 (2d Cir. 1973). A waiver in this regard is not quickly or lightly to be found. *See Glasser v. United States, supra,* 315 U.S. at 70–71, 62 S.Ct. at 464–65, 86 L.Ed. at 699–700. The court's interrogation of Mrs. Behar established that she was not prepared to have the court stand by and do nothing in the event an actual prejudicial action on the part of her lawyer arose. In other words, her waiver was not without strings. The district court handled the matter, we think, quite correctly, and Mr. Boitel withdrew quite correctly. *See United States v. DeBerry, supra; United States v. Dardi, supra.* We find nothing in the record to indicate that Mr. Rosenkrantz did anything other than what highly competent counsel would do, and nothing to indicate prejudice to appellant from his short infrequent absences. On this lengthy trial all counsel pinch-hit to a limited extent for one another; daily copy of the proceedings was available and the district court kept all counsel well informed and left open

---

10. Judge Travia's questioning showed great sensitivity to the need for gauging the "knowing and intelligent" qualities of appellant Behar's waiver, and it must have been statements of hers such as the following which gave him pause:

> I am in a frightening position so far as I am concerned. I have never before been a defendant and this case has changed, certainly, my life and my husband's life . . . this is an involved case. If an attorney is appointed and we have about two months

left—it is so comprehensive, there is so much to digest, I don't know if it can be done to my comfort.

> . . . . .

> I am willing to sign a waiver because I know the type—at least, I feel I know the type Mr. Boitel is.
> In addition, he has been part of this case for sixteen months. The new attorney, whoever he might be, is an unknown factor to me. I know Mr. Boitel well and as I say, I am exceedingly frightened.

the right to make any motion as counsel wished.

V. *Impermissible Joinder and Denial of Severance Motions.* Appellants Harry Bernstein, Rose Bernstein and ESC all contend that their convictions on the bribery counts should be reversed on the grounds of both impermissible joinder of offenses and of defendants and erroneous denial of their severance motions. But it is well established that under Fed.R.Crim.P. 8(b)[11] joinder of multiple defendants is proper if they are alleged to have participated in the same series of acts which are part of a common scheme or plan, or connected together. Here joinder of a conspiracy count and the substantive counts arising out of the conspiracy is proper since the charge of conspiracy provides a common link and demonstrates the existence of a common plan. C. Wright, Federal Practice and Procedure (Criminal) § 144, at 322 (1974). *See Schaffer v. United States,* 362 U.S. 511, 514, 80 S.Ct. 945, 947, 4 L.Ed.2d 921, 924 (1960); *United States v. Miley,* 513 F.2d 1191, 1209 (2d Cir. 1975); *United States v. Granello,* 365 F.2d 990, 993–95 (2d Cir. 1966), *cert. denied,* 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967). Joinder here was clearly proper since all the substantive counts were alleged as overt acts in the conspiracy count.

On the question of severance, again the matter is one for the trial court's discretion. *See* Fed.R.Crim.P. 14; *United States v. Projansky,* 465 F.2d 123, 138 (2d Cir.), *cert. denied,* 409 U.S. 1006, 93 S.Ct. 432, 34 L.Ed.2d 299 (1972). *See also United States v. Miley, supra; United States v. Papadakis,* 510 F.2d 287, 300 (2d Cir. 1975); *United States v. Granello, supra,* 365 F.2d at 944. Before trial the Government and the court had been scrupulous in cutting down the indictment and severing defendants therefrom. *See* note 3 *supra.* This

indictment originally named 21 individual and two corporate defendants and consisted of 211 counts. After assorted pretrial procedures, pleas of guilty, nolo contendere and assorted severances, the case went to trial with nine defendants. Furthermore, as a result of a motion by the Government to sever various counts and upon direction by the court to limit the number of counts, the number of counts was reduced to 65. We believe in this regard that, subject only to the legal questions whether there was here charged and proved a single conspiracy and whether there was a prejudicial variance from such a charge and the actual proof, the basic underlying admonitions of *United States v. Sperling, supra,* 506 F.2d at 1340–41, have been followed.

VI. *Sufficiency of the Evidence.* ESC contends that there was insufficient evidence to establish an intent to benefit it so as to support its conviction on the substantive counts charging bribery on Jet properties and aiding and abetting briberies on Kapraki properties. Appellant Rose Bernstein contends there was a failure of proof to support her conviction of aiding and abetting Kapraki's payment of bribes to Goodwin. Appellant Behar contends that there was insufficient evidence to establish the element of knowledge required to support her conviction on the substantive false statement counts. And appellant Cardona claims that his convictions were based entirely on the testimony of accomplices and asks us to reconsider our prior holdings in this regard.

Four substantive bribery counts, on each of which one or more of the appellants were convicted, involved Kapraki properties. In each case, Kapraki directly paid a $100 bribe to Goodwin. ESC contends that these bribes were solely for the benefit of Mrs. Kapraki, and hence that ESC could not have been found to have aided and abetted them. While these payments did help to

---

**11.** Fed.R.Crim.P. 8 provides:

(b) *Joinder of Defendants.* Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transac-

tions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

secure Goodwin's services to her, the ultimate intent of the parties was to encourage Kapraki to process her applications through ESC, which would then benefit therefrom in the "points" it charged for each deal closed. Kapraki's testimony establishes that both Rose and Harry Bernstein and Florence Behar counseled Kapraki to bribe Goodwin on these properties, and our recital of the facts indicates that the testimony from Kapraki, Goodwin, Cohen and Fey established the method used by the Bernsteins to arrange for Goodwin to be assigned to appraise these properties. By aiding and abetting the bribery, ESC and the Bernsteins successfully helped Kapraki to procure FHA approvals, and secured and kept her as a profitable client.

■ ESC claims that appellant Harry Bernstein intended only to benefit himself and not ESC in connection with the 14 counts involving his Jet properties, as to each of which ESC and Bernstein were convicted of bribing Goodwin. Bernstein, however, was the president and sole stockholder of ESC as well as the sole owner of Jet. Clearly he did intend to benefit himself, but his bribery had the neat effect of benefiting his interests in both capacities. ESC argues that Bernstein had two completely separate businesses, namely, operating ESC and speculating in real estate through Jet, and that his bribes may be viewed only as acts with the intent to further Jet's and thus his own profits. But evidence of the reality of an inextricably dual intent could not have been ignored by the jury: That is the intent to benefit ESC's interests as well as Jet's interests, both of whose profits would inevitably inure to Bernstein's personal benefit. Here again ESC was the approved mortgagee used to process Jet's applications, and if they were approved by the FHA, ESC would stand to make a gross profit on each property; it was in the interests of ESC to obtain a favorable appraisal from Goodwin and to have each deal closed. Furthermore, the greater the evaluation of each property, the higher the mortgage amount might become, and accordingly the more gross profit ESC would stand to make in points

charged. There was sufficient evidence for the jury to find an intent by Bernstein to further the interests of ESC, and thus to convict ESC on the Jet bribery counts.

■ Our summary of the evidence established clearly that Behar, who had the responsibility of signing the mortgagee's certificate on behalf of ESC, acted in the very least with a reckless disregard whether the statements made in the Form 2900 credit reports were false. She gave Kapraki blank verification of employment forms in violation of FHA regulations; she accepted Kapraki's statements that a coincidentally large number of her applicants were employed at the Bocar gas station; she ignored the warning of an experienced processor, Fey, who told her that she was accepting phony applications. She was receiving money on the side from Kapraki on each particular property; she was concerned about getting the "right" man in the credit section to examine and approve Kapraki's applications, and getting the "right" appraiser for her also; she never sent anyone out to check on the truth of the representations she was verifying, even when they were questioned by FHA or Dun & Bradstreet credit examiners. See United States v. Levinson, 405 F.2d 971, 986 (6th Cir. 1968), cert. denied, 395 U.S. 958, 89 S.Ct. 2097, 23 L.Ed.2d 744 (1969). Although Behar may not have had the authority to stop processing Kapraki's applications, she did have authority to report irregularities. Her failure to do so in the face of Kapraki's delinquency rate and heavy use of the same accountant, Blow (whose financial statements were in March, 1969, declared permanently unacceptable at ESC by Fey), together with the other evidence outlined above, was sufficient to support Behar's conviction on the false statement counts.

■ Appellant Cardona seeks a ruling that a guilty verdict may not rest upon the uncorroborated testimony of accomplices, in light of our decision in United States v. Taylor, 464 F.2d 240 (2d Cir. 1972). In Taylor, however, this court expressly limited itself to overruling United States v.

*Feinberg,* 140 F.2d 592 (2d Cir.), *cert. denied,* 322 U.S. 726, 64 S.Ct. 943, 88 L.Ed. 1562 (1944), which had held that the quality of evidence necessary to send a case to the jury in a criminal case was the same as in civil cases. There was no discussion in *Taylor* concerning the use of accomplice testimony, and, indeed, this court has consistently held that conviction upon such testimony is proper. *See, e. g., United States v. Messina,* 481 F.2d 878, 881 (2d Cir. 1973), *cert. denied,* 414 U.S. 974, 94 S.Ct. 286, 38 L.Ed.2d 217 (1974); *United States v. Ferrara,* 458 F.2d 868, 871 (2d Cir.), *cert. denied,* 408 U.S. 931, 92 S.Ct. 2498, 33 L.Ed.2d 343 (1972). Appellant has presented no arguments as to why our prior holdings should be overruled. The testimony of Kapraki and accountant Abad was corroborated here by documentary evidence, moreover, including specifically checks representing some of Kapraki's payments to Cardona for the false financial statements concerning self-employment.

VII. *Single Conspiracy and Variance.* All appellants argue vigorously that while the indictment charged only a single conspiracy the proof at trial showed multiple conspiracies. All appellants except Cardona contend that the court failed to charge the jury properly on the single conspiracy issue. Appellant Cardona claims that since he was not involved in the bribery of FHA appraisers he is entitled to a new trial even if a single conspiracy is found. Presumably all of these arguments would be all the more vigorous in the light of our decision a short time ago in *United States v. Bertolotti,* 529 F.2d 149 *et seq.* (2d Cir. 1975). There we reversed a conviction obtained in a narcotics case on the basis of a single conspiracy on the ground that the proof showed none such but rather a series of smaller conspiracies with a resultant material variance and a spillover effect involving the transfer of guilt from members of one conspiracy to another. *But see United States v. Steinberg,* 525 F.2d 1126, 1133 (2d Cir. Nov. 10, 1975). We think that the proof here was such as to entitle the jury to find but a single conspiracy. *See United States*

*v. Tramunti, supra,* 513 F.2d at 1105–07; *United States v. Sperling, supra.*

The conspiracy count charged was a single one, to defraud the FHA by obtaining mortgage insurance on inner city properties. The two objects charged, or the two steps by which the principal object of the conspiracy were obtained, were to bribe FHA officials in connection with their appraisals and to submit to the FHA false statements of the putative mortgagor's credit, employment or income in order to obtain approval of the mortgage insurance applications. Appellants contend that the transactions surrounding the Kapraki properties constituted a different conspiracy from those concerning the Jet properties, and that these conspiracies had unrelated purposes and no connection between them. Here, however, it is not the case that two groups, one organized by Kapraki for her benefit and another by Harry Bernstein for his, existed independently of each other with the coincidence that both of them used the services of the same FHA employee, Goodwin. The pattern of conspiracy here thus does not resemble that of the independent conspiracies in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and appellants' reliance on *Kotteakos* is foreclosed by the substantial evidence of a single conspiracy.

As our review of the facts reveals, it was Harry Bernstein as president of ESC and its principal officer who was at the very center or top of the conspiracy. It was Harry and Rose Bernstein who initiated the bribery relationship with Goodwin at the ESC office and who then provided Goodwin's services to their own client Kapraki. They were able to obtain the assignment of appraisals to Goodwin because of friendly relationships with Cronin and Cohen in the FHA office, indeed, on Cohen's part, a relationship founded in further bribery. The Bernsteins would activate this use of Goodwin upon the requests of Behar, who together with the Bernsteins informed Kapraki that she could get the "right" appraiser, but that they would have to be taken

**792**

care of, that is, bribed for a high appraisal. There was ample evidence to indicate that the bribery of Goodwin and the induction of Kapraki into using his services was done with the intent to benefit ESC in profits from points charged Kapraki. ESC, it should be noted, as Jet's processor, benefited in the same way from Jet property over-evaluations. Although Rose Bernstein was neither an officer nor an employee of ESC, she was intimately involved in its affairs and operations, and whether the properties were Jet's or Kapraki's, she participated with her husband in obtaining the unlawful services of Goodwin to inflate values.

 The desires of the Bernsteins to facilitate Kapraki's FHA approvals, for the benefit of ESC, extended to acquiescing in the submission of false statements, which activity was participated in most directly by ESC employees Behar and Cardona. Harry Bernstein closed his eyes to any irregularities in the Kapraki applications despite two instances of their integrity being questioned by his vice president, Fey. When Fey reported to both Bernsteins that he believed the Blow financial statements were frauds, they told him that it was up to the FHA to realize this, and Rose Bernstein reminded him of the number of points ESC was charging Kapraki for its processing. Here, unlike *Kotteakos, supra,* not only were the Bernsteins and ESC the central pivots of the scheme to defraud the FHA, but their activities and those of their coconspirators were linked through the common means of using the same FHA officials to achieve their common goal of benefiting ESC by defrauding the FHA. It is immaterial that Kapraki entered the scheme after it had started and that in connection with her properties there were additional elements of false statements which evolved. As the Court in *Blumenthal v. United States,* 332 U.S. 539, 68 S.Ct. 248, 92 L.Ed. 154 (1947), indicated, "[C]onspiracies involving such elaborate arrangements generally are not born full-grown. Rather they mature by successive stages which are necessary to bring in the essential parties." *Id.* at 556, 68 S.Ct. at 256, 92 L.Ed. at 168.

 Appellant Behar argues that even assuming the evidence established a single conspiracy there was insufficient evidence that her participation went beyond the applications of Mrs. Kapraki. She argues that the so-called "single act doctrine" is applicable to her. *See United States v. Sperling, supra,* 506 F.2d at 1342; *United States v. Torres,* 503 F.2d 1120, 1123 (2d Cir. 1974). But Behar was involved in a number of acts. Indeed, she was convicted of 18 false statements and three bribery counts. Her connection was, moreover, near the center of the conspiracy as head of the processing section of ESC. She played an active role in bringing Kapraki into the bribery phase of the conspiracy, making it clear to Kapraki that she should get the "right appraiser." The evidence is clear that she was aware of the Bernsteins' similar arrangements with respect to non-Kapraki properties. Since she was thus aware that the scheme was broader than her participation as an individual, she is bound by the acts of her co-conspirators. *See, e. g., United States v. Edwards,* 366 F.2d 853, 867 (2d Cir. 1966), *cert. denied,* 386 U.S. 908, 87 S.Ct. 852, 17 L.Ed.2d 782 (1967).

 Appellant Cardona claims that since the Government produced no evidence connecting him with the bribery-overevaluation aspect but only with the false statement phase of the conspiracy, he was substantially prejudiced by the bribery evidence and is entitled to a new trial. There was, however, ample evidence of a common goal by all the conspirators to thwart the operation of the FHA loan guaranty program in obtaining FHA insurance of ESC processed mortgages.

This is not the first time we have been presented with a single conspiracy in the furtherance of which different crimes were committed, or, indeed, in which one coconspirator joined in one of the illegal objects of the conspiracy but not in others. *See United States v. Levinson, supra* (VA home loan guaranty program). *See also United States v. Kelly,* 349 F.2d 720, 755–56 (2d Cir. 1965), *cert. denied,* 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966); *United*

*States v. Benjamin,* 328 F.2d 854, 864 (2d Cir.), *cert. denied,* 377 U.S. 953, 84 S.Ct. 1631, 12 L.Ed.2d 497 (1964) (two aspects of single scheme—selling unregistered securities and defrauding in sale of securities). As we said in *United States v. Borelli,* 336 F.2d 376, 384–87 (2d Cir. 1964), *cert. denied,* 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965),

> where the evidence is ambiguous as to the scope of the agreement made by a particular defendant and the issue has practical importance, the court must appropriately focus the jury's attention on that issue rather than allow it to decide on an all-or-nothing basis as to all defendants.

336 F.2d at 386 n. 4. This is exactly what the trial court did in our case, just as it had omitted to do in *Borelli.* Judge Travia charged the jury that it could find Cardona to be a member of the conspiracy if the scope of his agreement included one of the objects of conspiracy, provided that the jury first found that the single conspiracy charged did exist and that the scope of agreement made by at least two of the conspirators included both objects of the conspiracy. *See United States v. Levinson, supra,* 405 F.2d at 989; *United States v. Dardi, supra,* 330 F.2d at 327; *United States v. Benjamin, supra,* 328 F.2d at 864. *Cf. United States v. Papadakis, supra,* 510 F.2d at 297; *United States v. Arroyo,* 494 F.2d 1316, 1318–19 (2d Cir.), *cert. denied,* 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974). The jury was instructed repeatedly by the court that there was no evidence in the case connecting Cardona with the bribery object of the conspiracy. Here there was sufficient evidence to find a single continuing conspiracy by coconspirators including the Bernsteins, ESC, Behar and Kapraki, and to find that Cardona had joined with Kapraki, Abad and Blow, in a portion of the single conspiracy, the products of his frauds going unquestioned, indeed, by Behar, ESC and the Bernsteins. Here, as in *Borelli, supra,* what were required were appropriate instructions as to the scope of the agreement made by Cardona. These instructions were given here, and they were proper. As for any prejudice to Cardona, there was overwhelming evidence of his participation in the false statement frauds, making this hardly the case "where a minor participant in one conspiracy was forced to sit through weeks of damaging evidence" relating to others. *United States v. Miley, supra,* 513 F.2d at 1209. Cardona points out that one month at trial concerned the CUP prerogative of Cronin and one month the bribing of Goodwin. Cronin, it should be noted, was not convicted, and Cardona's own participation in the false statement scheme was so substantial that in a nine month trial we cannot find any significant prejudice from bribery testimony which the jury was instructed repeatedly did not connect Cardona to the conspiracy.

■ The appellants Harry and Rose Bernstein, ESC and Behar also argue that the trial court failed properly to instruct the jury that it must find a single conspiracy and not multiple conspiracies. However, the court explained the essential elements of the crime of conspiracy, focused the jury's attention in compliance with *Borelli* on the importance of determining whether each defendant became a member of the conspiracy and the scope of his or her agreement, and instructed the jury that it might find all, none or some of the defendants guilty or not guilty on the conspiracy count. The court instructed the jury that Count 1 "charges a single conspiracy having two objects or goals, and the burden is upon the Government to prove that charge as it's made beyond a reasonable doubt." In discussing membership in the conspiracy the court again emphasized that the jury must find that the single conspiracy charged in the indictment existed,[12] and in discussing

---

12. The court's exact words were:

Now, in order to find that a particular defendant has become a member of the conspiracy, it is not necessary to find that the defendant knew or was aware of both objects of the alleged conspiracy if you find beyond a reasonable doubt that the scope of the particular defendant's agreement included one of the objects of the conspiracy provided that you first find that the single conspiracy

the overt act element of the conspiracy the court reminded the jury that to convict it must find beyond a reasonable doubt that the single conspiracy having two objects as charged had been proved.

■ VIII. *Prosecutorial Mismanagement.* The claim is that the appellants were deprived of a fair trial by the sheer length of the trial allegedly caused by prosecutorial mismanagement. We have already stated, however, that the Government and the court here anticipated what was said in *United States v. Sperling, supra,* after the instant trial had commenced, by severing a number of defendants, reducing the number of counts, and making the case relatively manageable. *See* note 3, *supra.* It is, of course, always true that there can be some spillover and prejudice resulting when the conspiracy net is cast too wide, and draws in too many participants and too many hearsay statements. *See Kotteakos v. United States, supra,* 328 U.S. at 773, 66 S.Ct. at 1252, 90 L.Ed. at 1571. *See also United States v. Dardi, supra,* 330 F.2d at 329. The ultimate question is whether the number of defendants and complexity of the case prevents the jury from appraising the independent evidence against each defendant and meting out individual justice under the law. *See United States v. Stromberg,* 268 F.2d 256, 264–65 (2d Cir.), *cert. denied,* 361 U.S. 863, 80 S.Ct. 119, 4 L.Ed.2d 102 (1959). Here it was, of course, necessary to present both a good deal of background evidence to show the operations of the FHA and the context in which these criminal activities took place, and it was also necessary to introduce evidence as to a substantial number of transactions in order to present the true nature and scope of the criminal scheme. The bribery issues, on the other hand, ultimately boiled down to questions of credibility of the witnesses; on the false statement counts knowledge of falsity was the key issue, which was in turn dependent to a great extent on the credibility of the Government witnesses.

While it is not always necessarily wise to draw conclusions after the fact, the jury in this case does seem to have acted with extraordinary conscientiousness and sophistication. From time to time it asked for the relevant exhibits, for parts of the charge to be read, and even specifically for the charge regarding particular counts and particular defendants, indicating that it focused on each count and each defendant separately. The jury acquitted one defendant and was not able to reach a unanimous verdict as to three other defendants [13] who were not central figures in the scheme. Appellant ESC and appellants Harry Bernstein and Rose Bernstein were each acquitted on three bribery counts. Appellant Behar was acquitted on one bribery count. Such a performance by the jury belies appellants' claims that the length of the trial and the volume and complexity of the evidence disabled its members from evaluating and applying the evidence to the individual defendants.

This kind of crime is, furthermore, extraordinarily difficult to prove. It must be proven in bits and pieces. If it is broken down into too many charges, too isolated transactions, too many fragments, the concept of the crime is impossible to comprehend. We think that a conscientious prosecution managed to delimit the issues, narrow the trial, and yet satisfactorily demonstrate a pattern which constituted the overall crime. The claim of prosecutorial mismanagement is, in our view, utterly without merit.

■ IX. *The District Court's Interrogation of Mrs. Cardona.* Appellant Cardona argues that he was deprived of a fair trial as a result of the court's interrogation of Mrs. Cardona. *Compare United States v.*

charge in the indictment exists, and that the scope of the agreement made by at least any two of the defendants included both objects of the conspiracy.

The charge on conspiracy was adapted from suggested instructions concerning multiple conspiracies in E. Devitt & C. Blackmar, Federal Jury Practice and Instructions §§ 29.14, 29.-15 (1970 ed.).

**13.** *See* note 1 *supra.*

*Nazzaro,* 472 F.2d 302, 304 (2d Cir. 1973), with *United States v. Miley, supra,* 513 F.2d at 1205. *See also United States v. Natale,* 526 F.2d 1160, 1169–1170 (2d Cir. 1975). This interrogation concerned events taking place after the FBI commenced its investigation of this case. In August, 1971, Cardona had met at his home with an agent of the FBI, one James Sniegocki. Later that day Kapraki came to Cardona's house in response to the latter's call and Mrs. Cardona began to relate, on direct examination, the substance of the conversation between Kapraki and Cardona. We attach extracts of this testimony in the margin.[14] Cardona asserts that the court's subsequent intervention was a "vicious" cross-examination, indicated disbelief in the witness's testimony and was an attempt to put words in her mouth.

In our estimation, in these passages the court was not indicating its belief in the defendant's guilt or its disbelief in the witness's testimony, nor was it pushing Mrs. Cardona into altering that testimony. The testimony was unclear and it needed clarifying. At one point the court either misunderstood or did not hear the witness clearly, surely not an unforgivable sin in the course of a lengthy trial with, so far as it appears, a witness who might have been difficult to understand.[15] The witness's phrase "according to the conversation that my husband had with agent Sniegocki" was also susceptible to assorted interpretations. The court was trying to determine whether Cardona was telling Mrs. Kapraki to tell the FBI what he had told the FBI agent or whether Cardona had told Kapraki that she would be better off if she confessed without a lawyer. When the court said "no, no." [16]

> The Court: I'm only interested right now in the conversation between Mrs. Kapraki, your husband and you in your living room or parlor, as you call it.
>
> . . . . .
>
> The Witness: All right. He—he said to Ortrud Kapraki that it was better for her—It was—It was better for her to confess to the FBI without her lawyer.

14. Q. What, if anything else happened during that conversation?

A. My husband keep asking her to please to talk to the FBI and to do it without her lawyer and they kept—

The Court: To do it, what?

The Witness: Without her lawyer.

The Court: Whose lawyer?

The Witness: Kapraki's lawyer.

The Court: In other words, your husband was telling her what to do without his lawyer?

The Witness: Without her lawyer.

The Court: Without her lawyer?

The Witness: According to the conversation that my husband had with Agent Sniegocki.

The Court: He wanted Mrs. Kapraki to tell Agent Sniegocki what your husband told Sniegocki, is that what you mean?

. . . . .

The Witness: My husband asked Ortrud Kapraki, in his own words he said, "Please Ortrud, if you have done something wrong, it's better that you talk to the FBI by yourself, because this way you will feel better."

. . . . .

The Court: Then you said something in accordance with—

The Witness: Because—

The Court: Did you say that?

The Witness: Yes.

The Court: Your husband said, "In accordance with my conversation [sic].

The Witness: You want me to repeat it?

The Court: Yes.

The Witness: Yes, you want me to repeat the conversation with my husband, with Sniegocki—

15. See note 14 *supra* regarding the context of the interrogation where the court inquired as to whose lawyer Kapraki was told to speak to the FBI without. Throughout the testimony of Mrs. Cardona, audibility and comprehension evidently were made difficult by a soft voice, rapid speech, a language barrier or a combination of these. She was asked to speak up at least five times in the course of her testimony.

16. Following the colloquy cited, note 14 *supra,* the court went on to ask:

> The Court: You said earlier something about, he told her something about the FBI, something in accordance with the way I talked to him, what did you mean by that?
>
> The Witness: According to what the Agent Sniegocki asked to my husband.
>
> The Court: No, no.
>
> Mr. Klein: I submit, your Honor, that is an answer.
>
> The Witness: Yes, your Honor.
>
> The Court: Say that again.
>
> The Witness: According to what Agent Sniegocki have asked from my husband.
>
> The Court: That is what your husband told her?
>
> The Witness: Yes.
>
> The Court: You may proceed, Mr. Klein.

the judge was simply indicating that he wanted the witness to testify as to the conversation with Kapraki, not the conversation with Sniegocki. In the end even with the attempts at clarification the matter was so muddled that Cardona's counsel went over the entire conversation again. A federal district judge has, as we have repeatedly said, a duty to attempt to clarify the witness's testimony and to get the jury to understand the evidence. *See United States v. Natala, supra.* Judge Travia's limited intervention can sustain no claim of prejudice by Cardona.

 X. *The Charge on the False Statement Counts.* Perhaps appellants' strongest argument is, especially if we judge by the dissent, in respect to the charge on the false statement counts. ESC, Harry Bernstein and Behar all contend that the trial court's charge on the element of "knowledge" applicable to the false statement counts and the false statement object of the conspiracy was erroneous. The court alternatively charged "knowledge" in terms of "conscious avoidance" and "recklessness" and it is the "recklessness" portion here attacked.[17]

 Following proper instructions that specific intent was necessary and proof of mere negligence insufficient to convict, the court charged that the element of knowledge was satisfied by proof beyond a reasonable doubt that a defendant recklessly stated as fact things of which he was ignorant or acted with a reckless disregard of whether the statements made were true. Despite appellants' vigorous protestations to the contrary we have no difficulty in finding such a charge just as proper here as in the case of Securities Act violations. *See*

United States v. Benjamin, supra, 328 F.2d at 862–63. *See United States v. Squires,* 440 F.2d 859, 863–64 (2d Cir. 1971) (in areas of fiduciary responsibility under the securities laws "persons issuing statements are under an affirmative duty to investigate, and it is entirely appropriate to include 'should have known' within the definition of 'know' "). ESC, Bernstein and Behar knew that the FHA was relying on the Form 2900's submitted, and the mortgagee's certificate's declaration that the information was "true and complete to the best of its knowledge and belief" carries this obligation at least.

 The problem is that the court went on to attempt to describe the duty of the parties, of ESC as an FHA-approved mortgage lender and of Bernstein and Behar as key officers of such, with the evident purpose to give the jury some standard for determining whether there was such a reckless disregard of the facts as to amount to knowledge of the falsity of the Form 2900's. Judge Travia originally said that the duty was "to insure" that the statements made in the application were true, apparently borrowing the phrase from our opinion in *United States v. Andreadis,* 366 F.2d 423, 430 (2d Cir. 1966) (an alternative ground in holding that the Government proved knowledge of falsity was that the defendant failed totally to discharge "affirmative duty to insure" advertising claims were true), *cert. denied,* 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967). Conceiving, correctly we think, that a "duty to insure" rather overstates the mortgagee's responsibility— "reasonably to assure itself" would be more accurate—the judge below proceeded to

---

17. The conscious avoidance charge given was proper under *United States v. Brawer,* 482 F.2d 117, 128–29 (2d Cir. 1973), *cert. denied,* 419 U.S. 1051, 95 S.Ct. 628, 42 L.Ed.2d 646 (1974), and *United States v. Jacobs,* 475 F.2d 270, 287–88 (2d Cir.), *cert. denied,* 414 U.S. 821, 94 S.Ct. 116, 38 L.Ed.2d 53 (1973). However, there is no way of knowing on which basis the jury decided the case so that if the recklessness charge were erroneous the false statement counts and conspiracy count must fall.

We should add that use of the "reckless disregard" charge in this case is not inconsistent with *United States v. Bright,* 517 F.2d 584 (2d Cir. 1975). *Bright* requires that a charge that knowledge of falsity can be inferred from reckless disregard of the truth must be "balanced" by a charge that actual belief in the truth of the statement negates knowledge of falsity. The record shows that Judge Travia expressly gave this "balanced" charge twice [C463, C511]. We do not think that he had to do this again.

clarify the nature of the mortgagee's duty, describing it as "a duty to investigate and exercise proper credit judgment." [18] It is this portion of the charge to which the strongest objection is lodged as the "most aggravated" error, one compounded by the court's omission of any standard for determining good or bad credit judgment.

■ But, and this is what appellants overlook and the dissent misconceives, the charge did not indicate that it was a crime not to exercise "proper credit judgment" and did not equate failure to do so with reckless disregard of the truth. Rather, the charge was that the crime consisted of knowingly submitting an application containing a false statement and that proof of mere negligent falsehood was insufficient. The charge as we read it was that in determining whether there was reckless disregard of the statements' falsity such as to amount to knowledge, it was for the jury to determine whether as mortgagee ESC had affirmative duties in connection with mortgagors' loan guaranty applications. If such duties were found, the existence of potential recklessness was still a question of fact. The charge as such gave the defendants more than that to which they were entitled.

■ We say this because an FHA mortgagee cannot even be approved unless he is "responsible and able to service the mortgagee properly," 12 U.S.C. §§ 1709(b)(1), 1715*l* (d)(1). A mortgagor must under the regulations establish in an approved standard application form, 24 C.F.R. § 203.11 that the mortgage payments are within his means, 24 C.F.R. §§ 203.33, 203.34, 221.1. That form specifically requires a certificate by the mortgagee that "all information in the application is true and complete to the best of its knowledge and belief." Under the analogous civil case law the mortgagee, knowing that the federal insurer is "relying

on its professional judgment in a business relationship" has an affirmative duty "to use due care in providing information and advice" to the federal mortgage guarantor, *First National Bank, Henrietta v. Small Business Administration,* 429 F.2d 280, 287 (5th Cir. 1970); *Mt. Vernon Cooperative Bank v. Gleason,* 367 F.2d 289, 293 (1st Cir. 1966) (Veterans Administration). The entire scheme of FHA mortgage guaranties presupposes an honest mortgagee performing the initial credit investigation with due diligence and making the initial judgment to lend in good faith after due consideration of the facts found. The trial court in our view could have charged that ESC had commensurate duties as a matter of law, that Harry Bernstein as principal corporate officer did also, and that Florence Behar as officer in charge of processing mortgage loans and signing the mortgagee's necessary certification of the application as "true and complete to the best of its knowledge and belief" did likewise. It is our view that delimiting those duties by defining them as duties "to investigate" and to use "good credit judgment" was a fair description of the responsibilities inherent in the relationship between the defendants and the FHA, as we have above described it.

Thus, to reiterate, the phrase "proper credit judgment" was used simply in the context of defining the affirmative duties the FHA mortgagee has. In leaving to the jury the question whether any duties existed, duties which we think it is plain the mortgagee had as a matter of law, the appellants were obtaining the benefit of a charge more favorable than that to which they were entitled. Appellants rely on *United States v. Guterma,* 281 F.2d 742, 751–52 (2d Cir.), *cert. denied,* 364 U.S. 871, 81 S.Ct. 114, 5 L.Ed.2d 93 (1960), for the proposition that if the matter of duty was

---

18. The court charged the jury:
 [Y]ou may find that the FHA program places a duty on the mortgagee (Eastern and Harry Bernstein) to investigate and exercise proper credit judgment with respect to statements contained in applications for mortgage insurance submitted to the FHA.
 The court then told the jury:

 [I]f you find that there is such an affirmative duty, then the standard of recklessness, which I mentioned earlier, is applicable to the defendant Eastern Service Corporation, which is an approved mortgagee.
 Absent a finding of "such an affirmative duty" the jury was in effect directed to acquit without reaching the question of recklessness.

going to be charged at all it should have been charged as a matter of law.[19] In permitting the jury to determine the existence of the duties here, however, the court always clearly stated the crime to consist of recklessly stating facts of which the mortgagee was ignorant or acting with a reckless disregard of whether the facts stated were true. We do not see, therefore, how the appellants' substantial rights were in any way affected by the charge on exercising "proper credit judgment." If the jury decided that there were duties (to investigate and to use proper credit judgment), the appellants were no worse off than if the court had initially charged them that there were such duties as a matter of law, as we think it could have. If the jury decided that there were no such affirmative duties, then the appellants were, of course, much better off—they would have been entitled to acquittal according to the judge's instructions. They have in any event not been prejudiced.

XI. *The Trial Court's Intentional Omission to Marshal the Evidence.* While appellants complain of the length and prolixity of the trial, they also complain of the court's failure in the charge to summarize the evidence. This is a matter, surely, within the trial court's discretion. *United States v. Kahaner,* 317 F.2d 459, 479 n. 12 (2d Cir.), *cert. denied,* 375 U.S. 835, 84 S.Ct. 62, 11 L.Ed.2d 65 (1963); *United States v. Gillilan,* 288 F.2d 796, 798–99 (2d Cir.), *cert. denied,* 368 U.S. 821, 82 S.Ct. 38, 7 L.Ed.2d 26 (1961). That discretion was not abused. Exhaustive summations lasted 14 days. Kapraki and Goodwin had been on the stand 19 and 16 days respectively so that the jury could well weigh their credibility or lack of it. The court pointed out the principal differences in the evidence as to the appropriate defendants—*e. g.,* Rose Bernstein's lack of connection with the false statements and Cardona's lack of connection with the briberies. *Cf. United States v. Aloi,* 511 F.2d 585, at 598–99 (2d Cir.), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 447, 46 L.Ed.2d 386 (1975). It also stressed the importance of individual determinations as to each defendant on each count, a matter scrupulously observed by the jury if we are to judge from its inquiries and verdicts. *See* note 1 *and* Part VIII *supra.*

While the evidence here was complicated, or at least extensive, the issues were not. On the bribery counts, as we have observed, the issue was essentially one of credibility and on the false statement counts knowledge of the falsity. By circling in red the statements on the Form 2900 credit applications which were claimed to be false (and for all practical purposes admitted to be) the court accomplished a lot more than words in a charge could have done to direct the jury's attention to the critical facts. Here as in *United States v. Hyde,* 448 F.2d 815, 842 (5th Cir. 1971), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972), a detailed review of the factual transactions "carried risks of omission, over-enumeration, over-simplification of some facts compounded by over-complication of other facts." Here, as in *United States v. Cohen,* 145 F.2d 82, 92 (2d Cir.) (L. Hand, *J.*), *cert. denied,* 323 U.S. 799, 65 S.Ct. 553, 89 L.Ed. 637 (1944), "If the judge had once embarked upon a consideration of

19. In *United States v. Guterma,* 281 F.2d 742, 751–52 (2d Cir.), *cert. denied,* 364 U.S. 871, 81 S.Ct. 114, 5 L.Ed.2d 93 (1960), the court held that it was improper for the court to leave to the jury a task "properly his own," in that case interpretation of the term "net book value" in an SEC instruction, as applied to a pledge of securities. Here, of course, appellants below had argued that the matter of duty on their part should not be charged at all. Once the court decided to leave the question of duty to the jury instead of charging it affirmatively as a matter of law, appellants' immediate reaction was as follows:

The Court: (continuing) Or whether I would leave the question to the jury as a matter of fact to find. And I had come to the conclusion, unless the Government wishes to argue additionally, that I'm going to leave it to the jury as a question of fact.

Mr. Obermayer [for Dun & Bradstreet]: Fine. My application this morning—

The Court: Does the Government wish to argue on that point before—

[The balance of this colloquy is in dissent note 5.]

the transactions in detail, he would have committed himself to a discussion of them all; otherwise he would surely have laid himself open to the charge of undue emphasis." Judge Hand's words in *Cohen* are equally applicable here:

[I]n this country not only has the exercise of the power [to marshal the evidence] never been obligatory, but the power itself has been somewhat suspect. It is strange to hear an accused complaining of such a failure; we may be assured that, if the power had been used, the complaints would have been louder, and almost certainly better grounded.

145 F.2d at 93.

XII. *Other Points.* Appellants make three complaints about the charge on aiding and abetting the briberies. The first is that the court grouped the assorted defendants associated with ESC together, as it did assorted other defendants (the FHA defendants, the credit reporting defendants). We think this made sense, however, and note also that the jury was in conclusion instructed that individual verdicts as to particular defendants on each count were called for. The second objection is that the court charged that if the jury found a payment by Kapraki was made appellants' conviction must follow; this is entirely out of context, however, because the court gave a correct charge regarding the aiding and abetting of Kapraki; only in setting out the elements of the complicated lesser offense of giving a gratuity did the court say "you should determine with respect to each defendant whether or not the payment of money was made corruptly [elsewhere defined]," and "If you are convinced beyond a reasonable doubt that the payment was so made, then you must convict the defendant or defendants on that count." We view this as perfectly proper. The court, contrary to appellants' third argument, did charge what acts could be considered acts of aiding and abetting.[20]

Appellant Behar separately complains of prejudice by virtue of that portion of the charge that conditioned a finding of the guilt of Cardona or Harry Bernstein as aiders and abettors of the false statements upon a finding of guilt as to the principal (Behar, ESC). But it is the law that a person cannot be found guilty of aiding and abetting unless a principal whom he has aided and abetted committed the criminal act. *See Shuttlesworth v. City of Birmingham,* 373 U.S. 262, 83 S.Ct. 1130, 10 L.Ed.2d 335 (1963); *United States v. Hoffa,* 349 F.2d 20, 40 (6th Cir. 1965), *aff'd,* 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). *But cf. United States v. Bryan,* 483 F.2d 88, 93–94 (3d Cir. 1973) (not necessary that principal be tried and convicted or even identified); *United States v. Provenzano,* 334 F.2d 678, 691 (3d Cir.), *cert. denied,* 379 U.S. 947, 85 S.Ct. 440, 13 L.Ed.2d 544 (1964). Surely Behar and ESC were the principals in the false statement phase of the case. While the proof of Cardona's guilt was overwhelming, perhaps, there was no prejudice to Behar; it is not without significance that on one such count Behar was named and convicted while Cardona was not even named. We have previously commented on the jury's ability to view the evidence with a discriminating eye.

Finally, and this is a point on which my brothers and I disagree, appellants Harry Bernstein and ESC argue that certain of the bribery counts were multiplicitous (appellants use erroneously the term "duplicitous"). On four different occasions Bernstein paid Goodwin a lump sum for several property appraisals at $50 per appraisal, thus, for example paying him $350 on October 6, 1967, for seven property appraisals. The problem is that while only one payment of money was made on this occasion, appellants were charged in five counts (and incidentally Bernstein fined $10,000 for each count and ESC $20,000 for each, note 1 *supra* ). In totality four lump sum pay-

---

**20.** The court stated that appellants were charged

with aiding and abetting and counselling the payment of bribes to Edward Goodwin and the defendant Joseph Jankowitz and the

Government claims this was done by counselling payment of monies to these men and by arranging to have them assigned to Mrs. Kapraki's cases.

ments resulted in convictions on 11 counts. The question—one as to which there are no cases directly in point—is whether each lump sum payment constituted one crime or several, a single transaction or many. Appellants argue, and the writer agrees, that under 18 U.S.C. § 201(b) it is the corrupt gift which is the essential criminal act on the part of the donor, though it be with the intent to induce several criminal acts (and might be punished severally under 18 U.S.C. § 201(c) on the part of the donee).[21] *See generally Ladner v. United States,* 358 U.S. 169, 178, 79 S.Ct. 209, 214, 3 L.Ed.2d 199, 205–06 (1958); *Bell v. United States,* 349 U.S. 81, 84, 75 S.Ct. 620, 622–23, 99 L.Ed. 905, 910–11 (1955) (Frankfurter, *J.*).

▮ My colleagues take the entirely rational and different view and it is therefore the opinion of the court that separate offenses may arise out of the same transaction where each of the alleged offenses requires proof of some fact or element not required to establish the other. *See Albrecht v. United States,* 273 U.S. 1, 11, 47 S.Ct. 250, 253–54, 71 L.Ed. 505, 510–11 (1927); *United States v. Tarrant,* 460 F.2d 701, 704 (5th Cir. 1972); *Moeller v. United States,* 378 F.2d 14, 15 (5th Cir. 1967); *Newman v. United States,* 212 F.2d 450, 452 (6th Cir. 1954); *United States v. Michelson,* 165 F.2d 732 (2d Cir.), *aff'd,* 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948).

▮ It was not, in the majority's view, simply the payment of the money which constituted an offense under § 201; it was also the offering or promising to pay. The proof established that Harry Bernstein promised to pay $50 for each "top dollar" appraisal which Goodwin made. The Government offered separate proof with regard to each property to establish that it had been over-valued and that, as a result, a fraud had been committed upon the United States. That payments were thereafter made in installments which sometimes exceeded $50 did not require the number of statutory violations. The "official act" which had been improperly influenced under § 201 was the appraisal of each property on which a commitment was made for FHA mortgage insurance.

We have in short reviewed the extensive record and, with extremely careful and thorough argumentation by counsel, considered the numerous legal points arising out of this necessarily very lengthy trial. We are persuaded that the matter was handled with the greatest of care by the trial judge, with high competence by both Government and defense counsel, and with painstaking consideration of individual defendants and counts by the jury, under instructions that were, if anything, favorable to the accused. Several of the legal points were troublesome; indeed, we are not unanimous on all of them. The sentences were stiff. But these were serious crimes.

The judgment is affirmed.

---

**21.** The indictments here were for violations of 18 U.S.C. § 201(b). That section makes it a crime whenever a person

> directly or indirectly, corruptly gives, offers or promises anything of value to any public official or person who has been selected to be a public official, or offers or promises any public official or any person who has been selected to be a public official to give anything of value to any other person or entity, with intent—
>
> (1) to influence any official act; or
>
> (2) to influence such public official or person who has been selected to be a public official to commit or aid in committing or collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or
>
> (3) to induce such public official or such person who has been selected to be a public

> official to do or omit to do any act in violation of his lawful duty . . . .

It is also a crime for the recipient of the bribe who

> being a public official or person selected to be a public official, directly or indirectly, corruptly asks, demands, exacts, solicits, seeks, accepts, receives, or agrees to receive anything of value for himself or for any other person or entity, in return for
>
> (1) being influenced in his performance of any official act; or
>
> (2) being influenced to commit or aid in committing, or to collude in, or allow, any fraud, or make opportunity for the commission of any fraud, on the United States; or
>
> (3) being induced to do or omit to do any act in violation of his official duty . . . .

18 U.S.C. § 201(c).

VAN GRAAFEILAND, Circuit Judge (dissenting):

"Proper credit judgment" is a wonderfully impressive phrase, a portentous, businesslike phrase, one that rolls readily off the tongue of bankers and financiers in their board rooms and at their clubs. But, what does it mean? The statute under which defendants were convicted contains no reference to it. The district judge never instructed the jurors as to its meaning. We have no idea how these twelve untutored laymen defined it. Last, but not least, my brothers in the majority fail to enlighten us with their interpretation. And yet, this phrase, undefined, unexplained and uninterpreted to this date, forms the very core of the Government's case on the false statement counts as it was presented to the jury by the district judge.

The majority finds this to be merely "troublesome". I find it the culmination of a series of errors in the district court's charge which fairly cry for reversal. I, therefore, respectfully dissent.

Conviction of the defendants under 18 U.S.C. § 1010 required proof of three elements: the making of a false statement in the FHA application, knowing it to be false for the purpose of influencing the FHA to issue mortgage insurance. *United States v. Leach,* 427 F.2d 1107 (1st Cir.), *cert. denied,* 400 U.S. 829, 91 S.Ct. 57, 27 L.Ed.2d 59 (1970). The Government did not contend that appellants Harry Bernstein, Florence Behar and Eastern had actual knowledge of the falsity of any of the statements at issue herein. However, the judge instructed the jury that it was unnecessary for the Government to prove to a certainty that these defendants knew a statement was false. He charged that, although knowledge could not be established by proof of mere negligence, it might be found if a defendant was aware of the high probability that a statement was false, unless that defendant actually believed that the statement was not false. He charged further on the theory of conscious avoidance.

If the District Judge had stopped at that point, I would have no fault to find. *United States v. Bright,* 517 F.2d 584 (2d Cir. 1975); *United States v. Egenberg,* 441 F.2d 441, 444 (2d Cir.), *cert. denied,* 404 U.S. 994, 92 S.Ct. 530, 30 L.Ed.2d 546 (1971); *United States v. Abrams,* 427 F.2d 86 (2d Cir.), *cert. denied,* 400 U.S. 832, 91 S.Ct. 64, 27 L.Ed.2d 63 (1970); *United States v. Sarantos,* 455 F.2d 877 (2d Cir. 1972). However, the Judge continued on into what I conclude was error. He charged that it was a question of fact for the jury to determine if the FHA placed an affirmative duty on certain of the defendants.[1] He charged that, if there was a duty to investigate, proof of "recklessness" would satisfy the requirement of knowledge under the statute.[2] He then instructed the jury to determine as a question of fact whether the defendants Harry Bernstein, Florence Behar and Eastern had the duty to exercise "proper credit judgment" with respect to statements made

---

1. Now, it is a question of fact for you as jurors to determine from the evidence you have heard in this case—and you have heard testimony from HUD representatives and from others, the exhibits that you will find were introduced and received in evidence, the papers from which I just read now, which the Court took judicial notice of, and the mortgagee's handbook and the FHA manual, and whatever other evidence there was, if any, in the case, is for you to determine if the FHA, of the Housing and Urban Development, places an affirmative duty on certain of the defendants in this case.

 You may in making such a determination consider the regulations that have been read to you during the course of the trial, the testimony of the witnesses concerning them,

the instructions concerning the applications necessary to be filed, and the papers necessary to make up the complete application. You recall they referred to that as a package, if I recall correctly. [R. 21386].

2. Finally, in the contest [sic] of this case there is a third way of satisfying the requirement of knowledge. Where a person who makes, passes, utters or publishes a false statement is under an affirmative duty to investigate the element of knowledge is satisfied by proof beyond a reasonable doubt that a defendant recklessly stated as facts things of which he was ignorant, or acted with a reckless disregard of whatever statements made were true. [R. 21425].

in the mortgage insurance applications and to "insure" that such statements were true.[3]

The district judge never did specifically and clearly delete the word "insure" from his charge, although even the prosecution urged that he do so. His last instructions to the jury before it retired were:

Now, I also was asked to clarify the charge that I gave you concerning the affirmative duty.

You will recall that I referred to affirmative duty as being a question of fact for you to determine if the FHA [places] an affirmative duty on various defendants. I would like to clarify the nature of that duty which you may or may not find exists.

As to Eastern Service, Harry Bernstein and Florence Behar, the question is, one, was there a duty to investigate and exercise proper credit judgment with respect to statements contained in applications for mortgage insurance submitted to the FHA? [R. 21618].

I have quoted the pertinent portions of the district court's charge above and in the margin so that the reader might draw his own preliminary conclusions as to its fairness and accuracy. My own comments follow under appropriate headings.

### The Nature of the Offense

Defendants were indicted on conspiracy and substantive counts for alleged violations of 18 U.S.C. § 1010, which provides in pertinent part as follows:

Whoever . . . for the purpose of influencing in any way the action of [the Federal Housing Administration], makes, passes, utters, or publishes any statement, knowing the same to be false, . . . shall be fined [and/or imprisoned].

Defendants were not indicted for violation of instructions contained in the FHA manual or mortgagee's handbook.[4] Nor could they be. The Supreme court has, time and again, pointed out the difference between duties imposed legislatively and those imposed administratively and has held that "[w]here the charge is of crime, it must have clear legislative basis." *United States v. George,* 228 U.S. 14, 22, 33 S.Ct. 412, 415, 57 L.Ed. 712, 716 (1913). The contents of an administrative manual or handbook "cannot add to the terms of an act of Congress and make conduct criminal which such laws leave untouched." *United States v. Standard Brewery, Inc.,* 251 U.S. 210, 220, 40 S.Ct. 139, 141, 64 L.Ed. 229, 235 (1920). One may be convicted only for wrongful conduct "defined by statute or by

**3.** Now, in the light of the National Housing Act, part of which I read, and about which you heard testimony from Mr. Hipps, I believe, and possibly Mr. Sanders, the Federal regulations which were set forth in the eligibility requirements for approval of mortgagees who submit applications to the FHA and which set forth eligibility requirements for mortgagors, the the instructions contained in the mortgagee's handbook, the requirement that a mortgagee certify that all information in an application is true and complete to the best of its knowledge and belief, and the underlying policy of reliance by the FHA on the mortgagee to submit complete and truthful information, you may find that the FHA program places a duty on the mortgagee to investigate and exercise proper credit judgment with respect to statements contained in applications for mortgage insurance submitted to the FHA.

Now, if you find that there is such an affirmative duty, then the standard of recklessness, which I mentioned earlier, is appli-

cable to the defendant Eastern Service Corporation, which is an approved mortgagee.

You should also in that regard consider what persons played a role in setting the policy of Eastern Service Corporation with respect to credit applications, and what person had the responsibility to sign the mortgagee certificate on behalf of Eastern Service Corporation. Also, in this regard you may determine whether or not the evidence shows beyond a reasonable doubt that the defendants Harry Bernstein and Florence Behar occupied such a position. You may find that any person in such a position had an affirmative duty to insure that statements made in the application were true, and if you so find, then the standard of recklessness is also applicable to such a person. [R. 21425–26].

**4.** Although the District Court used the term "regulations", testimony introduced by the government indicated that the procedures outlined in the FHA manual and mortgagee's handbook were not regulations, but rather instructions.

regulation having legislative authority, and then only if punishment is authorized by Congress." *Viereck v. United States,* 318 U.S. 236, 241, 63 S.Ct. 561, 563, 87 L.Ed. 734, 738 (1943). As Mr. Justice Blackmun succinctly put it, while on the bench of the Eighth Circuit, "mere violation of a [Commodity Credit Corporation] 'policy' is not equivalent to a violation of [15 U.S.C.] § 714m(a)." *Jacobs v. United States,* 359 F.2d 960, 966 (8th Cir. 1966).

Section 1010 places no affirmative duty upon a mortgage insurance applicant to investigate and exercise "proper credit judgment" concerning the financial status of the mortgagor as described in the application. The majority opinion, on the contrary, does exactly that. My colleagues say that a mortgagor must "establish in an appropriate approved standard application form . . . that the mortgage payments are within his means" and that the mortgagee is required to certify that this is true to the best of its knowledge and belief. To equate defendants' failure to exercise this "proper credit judgment" with a reckless disregard of the truth, and thus with the knowledge of falsity required by § 1010, is to read something into the statute which is otherwise totally absent.

Although the dissent is said to have misconceived the judge's charge, the dissent conceives quite clearly that a defendant who is required to exercise "proper credit judgment" concerning a mortgagor's ability to make mortgage payments is held to a different standard of care than one who is not. Where such a standard is not imposed by statute or legislatively authorized regulations, it should not be created out of instructions in a manual and oral testimony. Permitting this to be done was error number one.

A number of statements are made by the majority in support of their decision to affirm with which I find myself in respectful disagreement. The first of these is Judge Oakes' statement that the defendant Behar signed certifications "verifying the truth of the information in the applications." In its unsworn applications for mortgage insurance, the mortgagee "represents" that "to the best of its knowledge and belief" no information contained in the papers furnished is untrue, incorrect or incomplete. A statement made to the best of a persons's knowledge and belief does not purport to be made on such person's actual personal knowledge and does not purport to "verify" the truth of the statement. *First National Bank v. Gregg,* 79 Pa. 384, 387 (1875).

The majority also says that the district court "proceeded to clarify" its charge concerning defendants' duty to "insure" the truth of statements in the application, which, it concedes, "rather overstates the mortgagee's responsibility." Clarifying is what the district judge said he was doing. However, what was required concerning the word "insure" was deletion, not clarification. In the absence of any definition of the phrase "proper credit judgment", the jury could, and in all probability did, conclude that defendants were required to exercise proper credit judgment to "insure" that the statements in the application were true. This was error number two.

I must take issue with Judge Oakes' statement that the district court's charge equating recklessness with knowledge was balanced, as required in *United States v. Bright, supra,* 517 F.2d at 588, by an additional instruction mandating acquittal if defendants actually believed that the statements made were true. In that portion of his charge dealing with conscious avoidance, the district judge did include this exculpatory clause.[5] However, that portion of the

---

**5.** Judge Oakes correctly states that the District Judge gave his "balanced" charge twice. However, this took place three days prior to the "proper credit judgment" portion of the District Judge's charge, when he was distinguishing between negligence on the one hand and reckless disregard and conscious avoidance on the other. The portion of the charge in which

this occurred had nothing to do with the affirmative duty of exercising "proper credit judgment". The District Judge charged that, where such a duty existed, there was a "third way" of satisfying the requirement of knowledge. He then stated that when a defendant is under an affirmative duty to investigate, "the element of knowledge is satisfied by proof be-

charge dealing with the duty to exercise "proper credit judgment" and "insure" the truth of statements has been set forth in full herein, and no such instruction is included.

There is a substantial difference between knowledge of falsity as used in the civil sense and in the criminal sense. *United States v. Cooperative Grain and Supply Co.,* 476 F.2d 47, 59 (8th Cir. 1973). Where knowledge is required for violation of a criminal statute, carelessness or lack of wisdom is not its equivalent. *Jacobs v. United States, supra.* I think our holding in *Bright* must be interpreted to mean that if a defendant actually believes that a statement is true, he cannot be convicted of a knowing falsity, regardless of how negligently he arrived at that belief. The application of this rule is especially important in a case such as this where the jury was permitted to impose duties upon the defendants derived only from administrative instructions and oral testimony. The failure of the district court to include the balancing clause required by *Bright* in the "proper credit judgment" portion of his charge was error number three.

### The Function of Court and Jury

In the early days of our country, it was customary in most courts for juries to be judges of both the law and the facts. III Wharton's Criminal Procedure § 1745, at 2184 (10th ed. 1918); Foley, Instructions to Juries—Their Role in the Judicial Process, 42 Yale L.J. 194, 202 (1932). However, in most jurisdictions, this practice did not long survive. Over one hundred years ago, this Court firmly announced its adherence to the doctrine that the court decides the law and the jury the facts. *United States v. Riley,* 5 Bl.C.C. 204 (2d Cir. 1864). Finally, in 1895, in the landmark case of *Sparf v. United States,* 156 U.S. 51, 15 S.Ct. 273, 39 L.Ed. 343 (1895), the Supreme Court declared that this procedure would henceforth be followed in all federal courts.

I have already expressed my firm conviction that the strictures imposed upon the defendants by 18 U.S.C. § 1010 could not be enlarged upon by instructions contained in handbooks or manuals of the FHA. Whether they were so enlarged upon in this case, we will never know. This knowledge is secure in the bosom of the jury. The district court left it to the jury to determine as a question of fact from the FHA booklets "and whatever evidence there was, if any, in the case" whether defendants had the affirmative duty to investigate the financial status of mortgage applicants and exercise "proper credit judgment" with respect to statements contained in their applications.

This was not a question of fact; it was a question of law. The construction of statutes and regulations is for the court, not the jury. *United States v. Santiago,* 528 F.2d 1130, 1135 (2d Cir. 1976); *United States v. Guterma,* 281 F.2d 742, 751–52 (2d Cir.), *cert. denied,* 364 U.S. 871, 81 S.Ct. 114, 5 L.Ed.2d 93 (1960); *United States v. Gillilan,* 288 F.2d 796–97 (2d Cir.), *cert. denied sub nom. Apex Distributing Co. v. United States,* 368 U.S. 821, 82 S.Ct. 38, 7 L.Ed.2d 26 (1961); *Caldwell v. United States,* 95 U.S.App.D.C. 35, 218 F.2d 370, 372 (1954), *cert. denied,* 349 U.S. 930, 75 S.Ct. 773, 99 L.Ed. 1260 (1955). If this were not so there would be as many rules as there are verdicts. *Northern Pacific Railway Co. v. Finch,* 225 F. 676, 678 (D.N.D.1915).

As Wharton points out, "if juries have any moral right to construe the law, it becomes essential to know what is the construction they adopt." Wharton's Criminal Procedure, *supra,* at 2186. Otherwise defendants will be left rudderless and without established standards to guide them. Moreover, an appellate court will have no means of determining whether a violation of rules

---

yond a reasonable doubt that a defendant recklessly stated as facts things of which he was ignorant, or acted with a reckless disregard of whatever statements made were true." To conclude that the jury was sophisticated enough to apply the balancing requirement of *Bright* to this "third way" of proving knowledge, is to credit these twelve laymen with a prescient grasp of legal principles not readily found even among lawyers.

and regulations, as they have been interpreted by a jury, has occurred.

I cannot better point out the necessity of knowledgeable appellate review than by reference to language in the majority opinion. Judge Oakes states that "if the jury decided that there were no such affirmative duties . . . [defendants] would have been entitled to acquittal . . . ." Let us assume—we will never know—that the jury did decide there were no affirmative duties. Should defendants not have been acquitted? How can we answer this? We are left to ruminate in a vacuum. We do not know what legal duties were imposed upon these defendants by the jury; no other court will ever know, and hundreds of other FHA mortgagees who would like to comply with the law will be equally at sea.

My brothers say that defendants were not prejudiced by the submission of these issues to the jury because the affirmative duty of exercising "proper credit judgment" was imposed upon defendants as a matter of law. I must again disagree. A statement that one is obligated as a matter of law to exercise "proper credit judgment" has little meaning if one doesn't know what "proper credit judgment" is. If my brothers would come forth with a definition of this phrase and then guarantee that the jury used the same definition in finding the defendants guilty, I might agree that no prejudice existed. So long, however, as the jury was free to define for itself the nature of the duty which, the majority says, was imposed upon defendants as a matter of law, the possibility of prejudice was inescapable.

Moreover, despite a thorough review of the FHA mortgagee's handbook and pertinent Federal regulations, I find nothing in any instruction, rule or regulation which imposes a duty upon a mortgagee to investigate and exercise "proper credit judgment" with respect to the statements contained in the mortgage insurance applications. This was the responsibility of the Commissioner. 24 C.F.R. § 203.34 provides that "a mortgagor must have a general credit standing satisfactory to the Commis-

sioner." Section 203.33 provides that a mortgagor's income may be considered adequate even though certain prescribed limitations are exceeded "if there are other, favorable compensatory factors present, as determined by the Commissioner."

Section 203.43a provides for the issuance of mortgages in older urban areas such as are involved herein, subject to a determination by the Commissioner "that the mortgage to be insured is an acceptable risk". The foreword to the mortgagee's handbook, prepared over the signature of the Commissioner, states that the eligibility of an application for mortgage insurance will be determined "only after complete analysis by the FHA field office with jurisdiction".

There is nothing in any of these provisions which places upon the mortgagee the duty of exercising credit judgment. We reach far afield when we find such a duty in the requirement that approved mortgagees must "service insured loans". 12 U.S.C. §§ 1709(b)(1), 1715*l*(d)(1); 24 C.F.R. § 203.9. "Insured" loans have already been made and insured. Servicing them has nothing to do with the exercising of "proper credit judgment" at the time the application for mortgage insurance was being made.

We also indulge in a dangerous practice when we cite cases from the civil side of the court as "analagous" when a determination of criminal liability is being made. *First National Bank, Henrietta v. Small Business Administration,* 429 F.2d 280 (5th Cir. 1970), and *Mt. Vernon Cooperative Bank v. Gleason,* 367 F.2d 289 (1st Cir. 1966), the cases cited by the majority, illustrate this very well. *First National* was an action to recover on a loan guaranty agreement, and the Court of Appeals held that the District Court erred in not submitting to the jury the question of whether the bank had been guilty of negligent misrepresentations in connection with the loan application. *Mount Vernon* was an action for declaratory judgment to determine the liability of the Veterans Administration under a loan guaranty certificate, the application for which had been forged. The regulations

governing the issuance of such certificates provide that there shall be no liability where the application therefor is a forgery. The Court held that the Administrator might rely on this disclaimer of liability. For purposes of determining the guilt of appellants in this criminal case, these decisions, I think, are not analogous.

We should also be careful not to transpose the fiduciary responsibilities imposed by the securities laws into a completely alien field. *United States v. Squires,* 440 F.2d 859, 863 (2d Cir. 1971). Where, as here, the FHA requires that it be furnished credit reports from established credit agencies such as Dun and Bradstreet, it can hardly be said to be relying upon the credit acumen of the mortgagee. Where the FHA furnishes a "Verification of Deposit." form for completion by the mortgagor's bank and a "Verification of Employment" form for completion by the mortgagor's employer, it certainly does not expect the mortgagee to go beyond the information contained in these forms and the Dun and Bradstreet credit report and conduct a credit investigation of its own. If it did so expect, it did

not say so. The charge of the trial court which permitted the jury to find such a duty was error number four.

The record is clear that the issue of "proper credit judgment" was inserted in the case at the instance of the Government and that it was the Government which wanted this issue submitted to the jury as a question of fact. The defendants opposed this from the outset, and the transcript is replete with illustrations of this fact. Defense counsel advised the court, for example, that the question of affirmative duty "was a legal issue rather than one that should be phrased for the jury to decide"; that it was "an affirmative legal duty, and it seems to me that the legal duty is to be determined solely by the Court and not by the jury"; that "its existence or lack of existence was a matter of law which must necessarily be determined in the first instance by the Court".

The trial judge did not decide upon his course of action until defense counsel Obermaier was in the middle of his summation. The colloquy between court and counsel at this point is set forth in full in the margin.[6]

**6.** Mr. DePetris [Asst. U. S. Atty.]: As I understand it you would tell the jury, you may find that there is an affirmative duty if you so find that the principle of recklessness—

The Court: Yes, instead of as a question of law. Because I have checked not only the National Housing Act, but all the regulations that have been discussed in the course of the trial and—and the argument produced by Defense Counsel—I don't remember which it was particularly—to the effect that there is no specific requirement in any of them stating that there is an affirmative duty on the part of anyone, except insofar as the mortgagee handbook is concerned which could be deduced such a duty insofar as the mortgagee is concerned, and those dealing with the application—the 2900 form. But I found nothing directly along the lines that might be applicable either to Dun & Bradstreet, Prescott &—and I just heard somebody quirp Eastern Service. But of course, I am not thinking about that.

Mr. Soviero: I wasn't quirping.

The Court: I know you weren't but you did say something in there. But Eastern Service I am categorizing as a mortgagee approved lender. And they are at least in command of, in possession of the mortgagee handbook from which some decisions could be arrived at by the jury to the effect that there is some duty

owing to the FHA. Whom I meant, however, was Cronin, I believe.

Now, if there is anything further, Mr. DePetris, I would be very happy to hear you before I make my decision final.

Mr. DePetris: No, Your Honor. In fact, that was the way we had initially submitted it in our request to charge. That is, leave it as a question of fact for the jury. And it was only that Defense Counsel requested that it be charged as a question as a matter of law. If Your Honor prefers to leave it to the question of the jury, then that's all right with us.

So as I understand it, they will be told they may find a duty—an affirmative duty. And if they do find, then the principle of recklessness—

The Court: Then it would apply.

Mr. DePetris: Fine.

The Court: But it's up to them to find.

Mr. Obermayer: Our application this morning was without prejudice to our position that it's not an appropriate subject for the jury.

The Court: All right.

Mr. Wall: Mr. Prescott will join in Dun & Bradstreet's motion.

The Court: Well, their position, if I understand it correctly, is that—

Mr. Wall: It's a question of law which should be charged to the jury.

I do not construe this exchange between court and counsel as a request by the defendants to charge affirmative duty as a question of fact. The defendants' subsequent exceptions to the charge as given clearly indicate that they did not so construe it. Assuming at the worst that defendants did not make their position clear to the trial judge, I would, nonetheless, conclude that his charge was so deficient and defective in material respects as to amount to plain error. *United States v. Clark,* 475 F.2d 240, 250 (2d Cir. 1973).

### What Is Proper Credit Judgment?

On October 3, 1967, Mr. P. N. Brownstein, Assistant Secretary-Commissioner, spoke at an FHA director's conference. He said that the requirement for a finding of economic soundness in riot or riot-prone areas was being eliminated. He stated that the FHA "must be willing to take the risks necessary to accomplish the urgent job of assisting and encouraging private enterprise to house low-and moderate-income families, and to revive the inner city." He told the directors "we should be prepared to take the risks that are justified and prudent in the light of the urgent social objectives to be achieved." C # 1164–78. These were the

The Court: Yes.
Mr. DePetris: Wait. As I understand it—
The Court: Mr. Obermeyer and Mr. Prescott—rather Mr. Obermayer and Mr. Wall both argue that it should be a question of law for the Court to decide and not for the jury to decide as a matter of fact.
Mr. Obermayer: Our position is—at least my position is that under these circumstances no affirmative duty arises, and the whole subject of affirmative duty should not be discussed with the jury. We understand the Court will discuss it with the jury and we are bound by Court's ruling in that regard.
The Court: All right.
Mr. DePetris: Is it your position that it should be charged one way or another as a matter of law?
The Court: No. He is saying not to take up the subject at all.
Mr. DePetris: Fine.
The Court: Do you understand that?
Mr. DePetris: Yes.
Mr. Obermayer: That's fine.
Mr. Wall: That is precisely Mr. Prescott's position.

professed aims of the FHA, made in accordance with a national housing policy seeking the elimination of sub-standard and other inadequate housing. 42 U.S.C. § 1441.

What, then, is the standard by which the "proper credit judgment" required of the defendants should be measured? Is it that which would be exercised by a prudent private investor, or should the broad social purposes of the National Housing Program be taken into account? The district court didn't say, and we, like the jury, are left in doubt. Such vagueness is fatal to the Government's position, because the jury was without any clearly defined standards by which defendants' guilt could be determined. *United States v. L. Cohen Grocery Co.,* 255 U.S. 81, 41 S.Ct. 298, 65 L.Ed. 516 (1921); *Smith v. Goguen,* 415 U.S. 566, 94 S.Ct. 1242, 39 L.Ed.2d 605 (1974).

In *United States v. Clark, supra,* 475 F.2d at 249, we quoted with approval Judge Hand's statement in *United States v. Gillilan, supra,* 288 F.2d at 797, that "the statute requires some definition of the meaning of the words which may not be left to the jury." In *Clark,* we found error in the trial judge's failure to charge the meaning of "specific intent" and "inference", which seem to me to be more easily defined than

Mr. Rosenkranz: Mrs. Behar joins in that.
The Court: Mr. Rosenkranz.
Mr. McEvoy, on behalf of Eastern Service and Harry Bernstein.
All counsel join? Is there any counsel who does not join?
Mr. Soviero: I don't join because I am not involved in any false statement counts. But I am named in the conspiracy count so I join.
The Court: All right. Mr. Soviero, well, you weren't—
Mr. Soviero: Well—
The Court: Your client.
Mr. Soviero: It's getting to feel that way, Your Honor.
The Court: All right. Then all counsel join. All right. I suppose, Mr. McEvoy, you join on behalf of Mr.—
Mr. McEvoy: Mr. Bernstein.
The Court: On behalf of Mr. Brodsky.
Mr. McEvoy: Yes.
The Court: All right. May we proceed then. [R. 19770–74].

"proper credit judgment". Where a jury, as in the instant case, is left to operate "almost completely in the dark", *United States v. Howard,* 506 F.2d 1131, 1134 (2d Cir. 1974), in an area as vital as this, it cannot be said that defendants have been fairly tried and convicted. This was error number five.

### Conclusion

In permitting the jury to determine as a question of fact whether the defendants Harry Bernstein, Eastern Service Corporation and Florence Behar were to be held to an undefined standard of exercising "proper credit judgment", the district court committed prejudicial error which requires reversal of the conviction of these defendants on the false statement counts.

Moreover, the prejudicial effects of the district court's errors cannot be limited to these charges and these defendants. Because the conspiracy charge against all defendants encompassed both bribery and the filing of false statements, I believe we have no alternative but to reverse all of the conspiracy convictions. The court's erroneous charge on the making of false statements must be held to have tainted the conspiracy convictions as well.

If the convictions on the conspiracy count are reversed, we are presented with the question of whether defendants were prejudiced by the eight months' trial involving 64 other counts, held together only by the charge of conspiracy. I agree with the majority that, so long as the conspiracy provided a link sufficient to demonstrate a common scheme or plan for joinder purposes, the question of prejudice, while close, was within the trial court's discretion. *United States v. Miley,* 513 F.2d 1191, 1209 (2d Cir. 1975). Moreover, there is no "hard-and-fast formula that, when a conspiracy count fails, joinder is error as a matter of law." *Schaffer v. United States,* 362 U.S. 511, 516, 80 S.Ct. 945, 948, 4 L.Ed.2d 921, 925 (1960). However, the trial judge does have a continuing duty at all stages of the trial to grant a severance if prejudice does

appear, *id.* at 516, and I think the duty to remedy prejudice becomes ours if such prejudice does not become apparent until the matter reaches our court.

In *United States v. Branker,* 395 F.2d 881, 887 (2d Cir. 1968), *cert. denied sub nom. Lacey v. United States,* 393 U.S. 1029, 89 S.Ct. 639, 21 L.Ed.2d 573 (1969), where the conspiracy count was dismissed at the close of the government's case, we said:

Originally twelve defendants and six co-conspirators were named in eighty-four counts. The eight defendants who were tried were named in eighty substantive counts charging violation of six criminal statutes. While it is true that this court has on several occasions sustained convictions on substantive counts after dismissal of a conspiracy count relied upon to justify joinder [citations omitted], we are not aware of any such case in which the number of counts even approached the number involved here. It is obvious that as the number of counts is increased, the record becomes more complex and it is more difficult for a juror to keep the various charges against the several defendants and the testimony as to each of them separate in his mind. [Citations omitted].

This kind of prejudice is particularly injurious to defendants who are charged in only a few of the many counts, who are involved in only a small proportion of the evidence, and who are linked with only one or two of their co-defendants. The jury is subjected to weeks of trial dealing with dozens of incidents of criminal misconduct which do not involve these defendants in any way. As trial days go by, "the mounting proof of the guilt of one is likely to affect another." [Citations omitted].

This quotation describes exactly the situation which existed in the trial below. The relationship between the false statement counts and the bribery counts was tenuous at best, and there was bound to be an adverse spillover effect from one to the other in this unduly long trial. *United*

*States v. Kelly*, 349 F.2d 720, 759 (2d Cir. 1965), *cert. denied*, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966). I will give only two illustrations. Appellant Rose Bernstein was forced to sit through eight months of unrelated and prejudicial testimony in order to be convicted on four counts of aiding and abetting bribery. Appellant Cardona was required to wait five months after the Government completed its proof against him before he was able to offer any testimony in his own defense. I cannot escape the "definite and firm conviction" that defendants may have been prejudiced by the trial resulting from the conspiracy charge which, in my opinion, cannot stand, and therefore their convictions must be reversed. See 1 Wright, Federal Practice and Procedure § 227, at 470 (1969.)

Following his conviction, Mr. Bernstein, a reputable "white collar" businessman, was sentenced to prison for five years. For this 67 year old man who had had a heart attack during the course of the trial, this could well be a life sentence. His 65 year old wife was given a four year sentence. Fines levied against them and their company totaled $685,000. Although the other defendants were treated somewhat more kindly by the District Judge, this was indeed, a vigorous performance of his duties. Before I can join my colleagues in approving this result, I must be more satisfied than I now am that the defendants received a fair trial.

I dissent.[7]

---

[7.] Among the issues which divided this panel was the claimed multiplicity of bribery counts. In order that disposition may be made of this issue, I join in so much of the opinion and judgment as holds that such counts were not multiplicitous.